**R. MALOBLOCKI & ASSOCIATES, INC.,**
Libelant-Appellant,

v.

**METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO,**
Respondent-Appellee.

No. 15430.

United States Court of Appeals
Seventh Circuit.

July 12, 1966.

Don M. Peebles, Halbert O. Crews, Steven P. Davis, Chicago, Ill., for appellant.

Fred F. Herzog, George A. Lane, Andrew Farenga, Chicago, Ill., for appellee.

Before DUFFY, CASTLE and KILEY, Circuit Judges.

484

KILEY, Circuit Judge.

The district court dismissed, for want of admiralty jurisdiction, this libel against respondent, the Metropolitan Sanitary District of Greater Chicago, claiming damages for breach of contract. Libelant, R. Maloblocki & Associates, Inc., has appealed. We affirm.

The District, by virtue of its responsibility for sewage disposal and control of water drainage in metropolitan Chicago, has jurisdiction, concurrent with the United States, over the Illinois Waterway flowing through Cook County. On September 20, 1962, it entered into a contract with libelant for removal of silt and overburden from the bed of the Des Plaines River, Brandon Road Pool, part of the waterway near Joliet, Illinois. The Illinois Department of Public Works, on July 13, 1962, issued a permit for the District's dredging of about 2,000,000 cubic yards of silt from Brandon Road Pool. On July 16, the U. S. Army Corps of Engineers issued a corresponding permit for the dredging of the "silt and overburden."

On September 27, libelant subcontracted with Construction Aggregates Corporation of Chicago for the assistance of the latter's floating equipment.[1] The work was begun but libelant alleges that, on March 8, 1963, without just cause, the District ordered a shutdown of the work, which lasted for a period of 66 days. In Count I of its libel it claims $77,807.36 for the balance due on work done, and in Count II claims damages of $684,688.00 for breach of contract because of the work stoppage.

The District moved to dismiss on the ground, among others, that the contract in suit was not a maritime contract and that the district court accordingly had no admiralty jurisdiction. The court took evidence in a hearing on the jurisdictional issue and sustained the motion to dismiss on that ground. The issue before us is upon the correctness of that ruling.

■ With respect to a challenge to admiralty jurisdiction, "the only question is whether the transaction relates to ships and vessels, masters and mariners, as the agents of commerce, on navigable waters." 1 Benedict, American Admiralty § 64 (6th ed. 1940). It is not enough that the dredge was a vessel sometime operating in navigable waters. The contract must be wholly maritime in nature, and relate to trade and commerce upon navigable waters. In re Hydraulic Steam Dredge Co. No. 1, 80 F. 545, 556 (7th Cir. 1897). See also the statements of Justice Story in Plummer v. Webb, 19 Fed.Cas. 891, 894 (No. 11,233) (C.C.Me. 1827).

The district court found that the primary purpose of the contract, known to libelant, was flood control; that the removal of the silt and overburden was done mostly outside the navigable part of the waterway; and that "any effect * * * upon navigability was, at best, incidental." The court noted the rules that admiralty jurisdiction is dependent upon the nature and character of the contract, that the contract must be "directly and in essence" and "essentially and wholly" maritime in nature, and that it was not enough that the work was to be done with respect to a vessel, but must "relate to trade and commerce upon navigable waters." The court concluded that the contract was not "essentially and wholly maritime in character" and that the court was without admiralty jurisdiction.

1. Respondent argues that this "subcontract" was in reality an assignment by libelant of all right, title and interest in the "prime" contract to Construction, the real party in interest, and that the libel must also be dismissed for failure to state a cause of action. In view of our disposition of this case, we do not reach this issue. It is interesting to observe, however, that the subcontract provides that Construction shall manage the project and be entirely responsible for the work at the job site, including the selecting of equipment for dredging work. Libelant's only duty was to take all steps necessary to secure respondent's approval of the subcontract, for which it was to receive 12½¢ per cubic yard of material removed from the waterway by Construction.

■ We think the record supports the district court's finding that the contract in suit was not "essentially and wholly maritime" in character, because the essential purpose of the contract was in aid of flood control, pursuant to the authority and responsibility of the District; that any deepening of the navigable channel was incidental to the purpose of removing the silt and overburden to open up a flood channel; that the District had no authority to aid navigation by the removal of silt and overburden; and that most of the work for which the alleged balance is due was done outside the navigable part of the water.

Libelant cites Kibadeaux v. Standard Dredging Co., 81 F.2d 670 (5th Cir. 1936), in support of its claim that the dredge was a vessel. There is no doubt that this is so. Kibadeaux involved a libel for personal injury due to the unseaworthiness of the dredge, and we point out that the court stated "[t]he injury occurred on navigable waters," since the dredge was "cleaning out and deepening the slips [in the Galveston, Texas harbor], * * * in which slips vessels plying in coastwise and foreign commerce were habitually moored." And in Henderson Bros. v. The Tipple Boat, No. 2, 97 F.Supp. 507 (N.D.W.Va.1951), the court found that the barge, a vessel, was being operated in furtherance of commerce on navigable waters. The dredge before us was a vessel, and the contract implicitly related to a vessel. The question remains, however, whether the dredge was doing work of commerce on navigable waters.

Libelant cannot successfully claim on this record that the court clearly erred in find that "most of the silt removal was done outside the navigable part of the waterway [and that] any effect the project may have had upon navigability was, at best, incidental." It argues, nevertheless, that it is not material "how much dredging was [done] in the navigable channel"; but that, assuming it is material, the evidence is clear that "almost all" the dredging was done in navigable waters. We think that, despite some evidence in its favor on the point, there was substantial evidence to support the court's finding with respect to Brandon Pool, where the work was done and work stoppage occurred, for which libelant claims the balance due and damages.

■ Libelant contends that the contract related directly to navigation because its performance affected navigation and could be achieved only with vessels engaged in navigation. It is our view, however, that the district court did not err in deciding that the vital question of admiralty jurisdiction is the nature of the transaction; that the purpose of the contract must be to aid navigation;[2] and that only a "wholly maritime contract," made so by that purpose, comes within the jurisdiction. That is the rule of this circuit expressed in In re Hydraulic Steam Dredge Co. No. 1, 80 F. 545 (7th Cir. 1897).

Libelant urges the circuitous theory that if the contract here was otherwise "wholly maritime" the fact that the purpose was flood control is irrelevant. It relies upon Kenny v. City of New York, 108 F.2d 958 (2d Cir. 1940), to support the theory. There the court held that a purpose of fireworks display in hiring a floating scow capable of navigation did not *alone* take the scow owner's damage suit out of admiralty. The facts there

2. Libelant, in arguing that the subject matter of the contract is wholly maritime because "navigation * * * in the Brandon Pool was vitally and directly affected by the work" (Appellant's Brief, p. 32), points out that the contract "to enlarge the Waterway" contains various provisions recognizing that there is substantial navigation in the area and the work must not obstruct that navigation. We think the contract terms relied on show at best an incidental effect intended to provide that this work not impede commerce at the project site. Further, the evidence shows that sole responsibility for the maintenance of the Congressionally established depth of nine feet rests with the Corps of Engineers, and that vessels drawing more than nine feet of water could not use the waterway either before or after the project undertaken by the parties here.

are different, and as we have indicated above with respect to the court's fact finding, the judgment here does not rest upon the purpose *alone*. Libelant also places reliance in Warren & Arthur Smadbeck, Inc. v. Heling Contracting Corp., 50 F.2d 99 (2d Cir.), cert. denied, 284 U.S. 651, 52 S.Ct. 31, 76 L.Ed. 553 (1931), where the Second Circuit brushed aside the objection that admiralty had no jurisdiction because the dredge there was chartered for the non-maritime venture of sucking sand for building up new land. The court said cryptically: "But the charter upon which the suit rests was a maritime contract, and the admiralty court had jurisdiction." This simple statement seems to support libelant's view and oppose the rule in *In re Hydraulic Steam Dredge Co. No. 1*.

In both the *Smadbeck* and *Kenny* cases, however, the Second Circuit relied upon Bowers Hydraulic Dredging Co. v. Federal Contracting Co., 148 F. 290 (S.D. N.Y.1906), aff'd, 153 F. 870 (2d Cir.), cert. denied, 207 U.S. 587, 28 S.Ct. 255, 52 L.Ed. 352 (1907). There libelant sued for hire of a dredge. The chartered dredge was used for dredging material from the Passaic River and dumping the material on shore, but was "not employed in deepening the channel." Libelant contended admiralty had "jurisdiction over dredges," and respondent contended the contract was "not in any sense for a maritime service" and not within the ambit of the dredge decisions. The district court decreed in favor of libelant.

The court quoted a Judge Hanford upon the variety of dredge cases and the difficulty in finding a guiding principle with respect to that libelant's contention, and discussed In re *Hydraulic Steam Dredge Co. No. 1*, cited there by Federal Contracting Co. in support of its contention. The court stated in effect that but for Justice Holmes' decision in The Blackheath, 195 U.S. 361, 25 S.Ct. 46, 49 L.Ed. 236 (1904), the case should be decided in favor of Federal Contracting. It concluded that "it is the duty of courts to amplify their remedies, and without usurping jurisdiction, to apply their rules, to the advancement of substantial justice." 148 F. at 295. On appeal, the Second Circuit held "as to the jurisdiction * * * we concur in the reasoning and conclusion" of the district court. 153 F. at 873.

In *The Blackheath* a British ship, sued in rem, was alleged to have negligently damaged a beacon set outside the channel "of Mobile river, or bay." The district court dismissed the libel. Justice Holmes wrote the opinion reversing the judgment. The result circumvented the earlier English and American rule which confined admiralty jurisdiction, in tort cases, "in respect of damage to property, to property afloat," [3] under which rule the libel would not be sustained because the beacon was fixed to the bottom of the river. Justice Holmes said there that "the early law" looked mostly to the motion of the vessel, in fixing liability upon the vessel, as making it responsible,[4] and

---

3. 195 U.S. at 364, 25 S.Ct. at 47. This notion probably stems from the historic idea that admiralty should be confined to things done upon the sea, "out of reach" of the common law court. 2 Chitty's Blackstone, Book the Third, at 80 (1833 ed.):

All admiralty causes must be therefore causes arising wholly upon the sea, and not within the precincts of any county (*i*) (19). For the statute 13. Ric. II. c. 5. directs that the admiral and his deputy shall not meddle with any thing, but only things done upon the sea; and the statute 15. Ric. II. c. 3. declares that the court of the admiral hath no manner of cognizance of

any contract, or of any other thing, done within the body of any country, either by land or water; * * *.
See also Justice Story in Plummer v. Webb, 19 Fed.Cas. 891, 892 (No. 11,233) (C.C.Me.1827).

4. Holmes, The Common Law 26–27 (1945):
* * * if a man was killed or drowned at sea by the motion of the ship, the vessel was forfeited to the admiral upon a proceeding in the admiral's court, and subject to release by favor of the admiral or the king.
A ship is the most living of inanimate things. Servants sometimes say "she" of a clock, but every one gives a gender to vessels. And we need not be sur-

that "the Constitution does not prohibit what convenience and reason demand." [5]

The district court in *Bowers* drew upon *The Blackheath* for its decision that the scow there was a floating structure whose ordinary purpose was maritime and that admiralty jurisdiction should not be ousted because the scow's work was being done partly on land. The court presumably was persuaded by a statement in the concurring opinion in *The Blackheath* to the effect that remedies should be amplified to advance substantial justice where it can be done without usurping jurisdiction.

We think this court's decision in In re Hydraulic Steam Dredge Co. No. 1, 80 F. 545 (7th Cir. 1897), is unaffected by the *Bowers* case or the *Smadbeck* and *Kenny* cases bottomed on *Bowers*. It is one thing to extend remedies to meet contemporary needs of justice, but it is quite another thing, as Justice Story said in Plummer v. Webb, 19 Fed.Cas. 891, 895 (No. 11,233) (C.C. Me.1827), to strain admiralty jurisdiction to reach cases of an ambiguous character. This view seems to us particularly appropriate since the right of trial by jury is obviated in admiralty; the remedy here exists, but in a court of law.

Libelant seeks to distinguish *In re Hydraulic Steam Dredge Co. No. 1* on the grounds that the dredge there was not registered under the shipping laws of the United States, that the purpose of the work was to suck sand from the lake bed to build land on shore, ("not to deepen the channel," as here [6]), and that there was no evidence that vessels ever engaged in navigation at the place the dredge was in operation. We think the registration is not a controlling element. A registered vessel may be used in matters not wholly maritime in nature, as was the dredge before us (which was enrolled after execution of the contract in suit). This court in *In re Hydraulic Steam Dredge Co. No. 1* noted that the dredge there floated on navigable waters, which the court said was not controlling and that the only possible relation of the work to navigation was that in sucking sand the channel was deepened. The court then stated: "That was not, however, for the purposes of navigation. * * * The effect upon the channel was incidental and subordinate. * * * It is of no moment that the structure floated upon the water, and dug out the bed of the lake." The court affirmed dismissal of the suit in admiralty to establish a lien for coals supplied to the dredge.

Justice Holmes pointed out in *The Blackheath* that "[t]he precise scope of admiralty jurisdiction is not a matter of obvious principle or of very accurate history." 195 U.S. at 365, 25 S.Ct. at 47. We think the constant, in the various decisions, that has decided the great variety of contract cases brought to admiralty, is that the contract must be wholly mari-

---

prised, therefore, to find a mode of dealing which has shown such extraordinary vitality in the criminal law applied with even more striking thoroughness in the Admiralty. It is only by supposing a ship to have been treated as if endowed with personality, that the arbitrary seeming peculiarities of the maritime law can be made intelligible, and on that supposition they at once become consistent and logical.

Holmes does not say why "every one" attributes feminine gender to ships. The likely reason is that "ship," in Latin, is "navis," a feminine noun. One may be pardoned for wondering whether everyone would attribute feminine gender to the dredge "Sensibar Sons," before us, as opposed to the British vessel "The Blackheath."

5. 195 U.S. at 367, 25 S.Ct. at 48; Justice Holmes concluded:

It is enough to say that we now are dealing with an injury to a government aid to navigation from ancient times subject to the admiralty, a beacon emerging from the water, injured by the motion of the vessel, by a continuous act, beginning and consummated upon navigable water, and giving character to the effects upon a point which is only technically land, through a connection at the bottom of the sea.

6. Appellant's Brief, pp. 36–37, and Appellant's Reply Brief, pp. 12–13; see, however, note 2 supra.

time in nature. And the nature of the transaction in each case is determined by the facts in each. In our opinion, in the case before us, as in the other cases, the purpose of the contract is largely determinative because the purpose largely determines the nature of the transaction.

 The district court in substance found that the purpose of the contract was flood control and that enlargement or deepening of the channel was incidental, that most of the work upon which the suit is brought was done in nonnavigable waters, that the District had no jurisdiction to aid navigation, and that the contract for removal of silt and overburden was not wholly maritime. We agree, we so hold, and we affirm.