In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-2137

THE ST. PAUL TRAVELERS COMPANIES, INC.,
F/K/A ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

*Plaintiff-Appellee*,

*v.*

CORN ISLAND SHIPYARD, INC.,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 04 CV 154—**David F. Hamilton**, *Judge.*

———————

ARGUED DECEMBER 7, 2006—DECIDED JULY 18, 2007

———————

Before BAUER, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* The St. Paul Travelers Companies, Inc. ("St. Paul") filed a declaratory judgment action seeking a determination of its obligation, if any, to cover the claims of a Corn Island Shipyard, Inc. ("Corn Island") employee under an insurance policy St. Paul had issued to Corn Island. The district court granted summary judgment in favor of St. Paul concluding that because Corn Island failed to provide St. Paul adequate notice of its

claim, coverage was barred as a matter of law. Although we reach the notice issue by a different path, we affirm the judgment for St. Paul.

I.

Corn Island owns and operates a shipyard along the Ohio River near Grandview, Indiana. Through its insurance broker, Corn Island purchased several insurance policies to cover its various liabilities, including a Workers Compensation and Employers Liability Insurance Policy from Fremont Industrial Indemnity Company ("Fremont") and an Ocean Marine bumbershoot policy from St. Paul.[1]

On February 2, 2001, Rick Williams, a Corn Island employee, sustained burns over sixty-five percent of his body after his clothes ignited while he was cleaning paint equipment with flammable thinner on Corn Island's premises. After Williams received extensive treatment, the United States Department of Labor ("DOL") declared him permanently and totally disabled and entitled to payment from Corn Island of permanent total disability benefits under the Longshore & Harbor Workers' Compensation Act (the "LHWCA"), 33 U.S.C. § 901 et seq. Under the policy it had issued to Corn Island, Fremont was responsible for both Williams's medical expenses and the

---

[1] A "bumbershoot" is "[a] marine insurance policy covering multiple liability coverages in excess of one or more different underlying policies (comparable to the Commercial Liability Umbrella covering liabilities on land). 'Bumbershoot' is the English word for 'Umbrella'; i.e., 'all encompassing.' " *Glossary of Marine Insurance and Shipping Terms*, 14 U.S.F. Mar. L.J. 308, 325.

permanent disability benefits due under the LHWCA.[2] Fremont paid out under its policy $1,044,666.68 in medical expenses and $52,236.33 in benefits, but ceased paying benefits in the summer of 2003 when it became insolvent. After learning of Fremont's insolvency, Corn Island's insurance broker contacted the Indiana Insurance Guaranty Association, which agreed to accept Williams's claim up to a maximum limit of $100,000.00.[3]

On September 11, 2003, the DOL notified Corn Island that Corn Island remained liable for Williams's benefits under the LHWCA despite Fremont's insolvency. Nearly five months later, on February 16, 2004, Corn Island contacted St. Paul about Williams's accident and sought coverage for Williams's benefits. In its response letter, St. Paul reserved its rights under its policy to deny coverage and raised a potential issue of late notice and questioned whether its policy covered Corn Island's claim. After an investigation, St. Paul denied Corn Island's claim on June 21, 2004, stating, in part, that it had no obligation under its policy for Williams's benefits.

---

[2] Under the LHWCA, an employer is responsible to provide coverage to its employees for injuries covered by the statute and may substitute an insurance company for its obligations. *See* 33 U.S.C. §§ 904, 905, 933. A "Card Report of Insurance" is filed by an insurance company for each policy issued to an employer. *See* 20 C.F.R. §§ 703.116, 703.2. Fremont was the only insurance company designated on Corn Island's "Card Report of Insurance" on file with the DOL under the LHWCA.

[3] Corn Island also contacted the California state agency appointed as Fremont's liquidator seeking recovery from Fremont's estate. To date, those efforts have not proven fruitful.

St. Paul then filed suit seeking a declaratory judgment that it was not obligated to pay Corn Island's claim for Williams's injuries or, alternatively, if it had an obligation under its policy, that Corn Island provided late notice of the claim thereby precluding coverage. The parties filed cross-motions for summary judgment. Without addressing the coverage issue, the district court granted St. Paul's motion and denied Corn Island's motion. The district court concluded that the notice provision of the LHWCA did not apply, but rather New York law applied, and that under New York law, Corn Island's delay in notifying St. Paul of Williams's claim barred coverage as a matter of law.

In reaching its conclusion, the district court held that the choice of law provision in the St. Paul policy that elected New York law was valid and enforceable. The district court also concluded that the LHWCA did not apply to the St. Paul policy because Corn Island never treated St. Paul as a carrier under the LHWCA and because the notice provisions of the LHWCA did not apply to excess carriers. Accordingly, the district court held that the notice provisions of New York law governed. Because Corn Island's notice to St. Paul was late under New York law, the district court concluded that coverage was barred, regardless of whether the St. Paul policy provided coverage for Williams's LHWCA claims. Corn Island appeals.

## II.

On appeal, Corn Island argues that the district court erred in granting St. Paul summary judgment. Specifically, Corn Island claims that the LHWCA governed, and not

New York law, the issue of notice and that under the LHWCA, it provided St. Paul with adequate notice. Corn Island further asserts that the St. Paul policy provides coverage for Williams's claims. We review a district court's grant of a motion for summary judgment de novo. *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (citation omitted).

It is undisputed by the parties that Williams's injuries and resulting claims fall under the LHWCA, and that Corn Island is responsible for those claims. What is disputed, though, is whether St. Paul is obligated to provide coverage for those claims under the policy it issued to Corn Island. Also, while the parties do not dispute that New York law governs the interpretation of the St. Paul policy, the parties disagree as to whether the LHWCA or New York law should govern the notice issue in this case. Under the LHWCA, notice to the employer constitutes notice to the carrier. 33 U.S.C. § 935. Under New York law, however, "compliance with the notice provisions of an insurance contract is a condition precedent to an insurer's liability." *Am. Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 438 (2d Cir. 1995) (citation omitted). An insured's failure to provide timely notice of an injury, without a valid reason for the delay, frees the insurer from covering the claim. *Id.* Corn Island asserts that New York's law does not govern the question of notice because it contravenes the LHWCA, particularly §§ 935 and 936. St. Paul responds that New York law does not contravene the LHWCA, and to the extent that the LHWCA applies, St. Paul is not a carrier under the LHWCA.

Because it is undisputed that the LHWCA governs the injury for which coverage is sought, we first review the LHWCA provisions concerning insurance coverage,

including the role established for insurance carriers, who qualifies as an insurance carrier, and what constitutes timely notice. This backdrop is necessary to determine whether the LHWCA or New York law applies to the notice issue in this case and ultimately to determine whether St. Paul is obligated to cover Williams's claims under the policy it issued to Corn Island. We are not addressing simply an insurance contract coverage issue which generally would be governed by state law in a case based on diversity jurisdiction.[4] Rather, we are determining whether a particular insurance policy provides coverage for a federal statutory-based claim which addresses insurance carriers and notice to them. Therefore, we must look to the LHWCA first.

As its name suggests, the Longshore and Harbor Workers' Compensation Act is a statutory scheme "created to compensate maritime employees for on-the-job injuries leading to death or disability." *Bunge Corp. v. Carlisle*, 227 F.3d 934, 936 (7th Cir. 2000). Under the LHWCA, employers are responsible for compensating injured employees regardless of fault. *See* 33 U.S.C. §§ 904, 905. An employer may substitute an insurance carrier for itself to discharge its obligations and duties under the LHWCA. 33

---

[4] The parties also assert admiralty jurisdiction, which the district court determined was not present in this case. While the parties do not raise this issue on appeal, we agree with the district court's conclusion that because the St. Paul policy covers both land and navigable water-based liabilities and is not focused on maritime commerce, admiralty jurisdiction does not extend to this case. *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 24 (2004); *R. Maloblocki & Assoc., Inc. v. Metro. Sanitary Dist. of Greater Chicago*, 369 F.2d 483, 484 (7th Cir. 1966).

U.S.C. § 935. Specifically, Section 935 provides, in relevant part:

> In any case where the employer is not a self-insurer, in order that the liability for compensation imposed by this chapter may be most effectively discharged by the employer, and in order that the administration of this chapter in respect of such liability may be facilitated, the Secretary shall by regulation provide for the discharge, by *the carrier for such employer*, of such obligations and duties of the employer in respect of such liability, imposed by this chapter upon the employer, as it considers proper in order to effectuate the provisions of this chapter. For such purposes (1) notice to or knowledge of the employer of the occurrence of the injury shall be notice to or knowledge of the carrier . . . .

*Id.* (emphasis added).

Under the LHWCA, a carrier is "any person or fund authorized under section 932 of this title to insure under this chapter and includes self-insurers." 33 U.S.C. § 902(5). Section 932, in turn, provides:

> Any marine protection and indemnity mutual insurance corporation or association, authorized to write insurance against liability for loss or damage from personal injury and death, and for other losses and damages, incidental to or in respect of ownership, operation, or chartering of vessels on a mutual assessment plan, shall be deemed a qualified carrier to insure compensation under this chapter.

33 U.S.C. § 932(b).

On appeal, St. Paul argues that it is not a carrier for purposes of the LHWCA and therefore the LHWCA's

notice provisions do not apply. In support of its position, St. Paul cites *Pennsylvania National Mutual Casualty Insurance v. Spence*, 591 F.2d 985 (4th Cir. 1979), and *United States Casualty Company v. Taylor*, 64 F.2d 521 (4th Cir. 1933), claiming that these cases show that only those insurers identified with the DOL as carriers qualify as carriers under the LHWCA. However, contrary to St. Paul's position, neither of those cases addressed that issue. Rather, in *Spence*, the Fourth Circuit addressed whether the insurance carrier that provided coverage at the time of an employee's injuries was also liable for the employee's later death that resulted from the injuries. *Spence*, however, did not discuss carrier designation. *Spence*, 591 F.2d at 986-88. Similarly, in *Taylor*, the Fourth Circuit did not address carrier designation, but instead held that an insurance carrier had a right to intervene in a case involving an employee's claim under the LHWCA, but did not address that carrier's designation. *Taylor*, 64 F.2d at 522-27. Corn Island, in reply, contends that St. Paul has not asserted that it is not authorized to underwrite insurance under the LHWCA. Nothing in the record indicates whether St. Paul is authorized to issue policies under the LHWCA, that is, whether St. Paul is a carrier. Therefore, we are unable to determine whether St. Paul is a carrier as defined by the LHWCA. Regardless, even if St. Paul qualifies as a carrier under Section 902, this does not resolve whether St. Paul is *Corn Island's* carrier, which is determinative of whether New York law or the LHWCA governs notice in this case.

The district court noted that Corn Island had never treated St. Paul as its carrier under the LHWCA. Whether Corn Island ever treated St. Paul as a LHWCA carrier, however, is inconclusive in determining whether St. Paul

is a carrier under the LHWCA. Rather, the insurance policy that established a relationship between St. Paul and Corn Island dictates whether St. Paul is Corn Island's LHWCA carrier. *See Tarantola v. Williams*, 371 N.Y.S.2d 136, 139 (N.Y. App. Div. 1975) ("Of course, the subjective notions of parties to contracts do not determine the legal rights and duties created by a writing of the agreement."). *See also Feder v. Caliguira*, 171 N.E.2d 316, 318 (N.Y. 1960) (" '[W]e must look to the rights it (the agreement) confers and the obligations it imposes' in order to determine the true nature of the transaction and the relationship of the parties." (quoting *New York World-Telegram Corp. v. McGoldrick*, 80 N.E.2d 61, 63 (N.Y. 1948))); *EBC I, Inc. v. Goldman Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) ("Generally, where parties have entered into a contract, courts look to that agreement 'to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency . . . .' " (quoting *N.E. Gen. Corp. v. Wellington Adv.*, 624 N.E.2d 129 (N.Y. 1993))).

In concluding that New York notice law applied, the district court stated that Section 935 of the LHWCA (the notice provision) did not apply to excess carriers. Neither the district court nor St. Paul provided any citation in support of this conclusion. Nor do we find any support in the statutory language for the proposition that the LHWCA does not apply to excess carriers. Rather, the language of the statute does not address excess carriers or differentiate between primary and secondary policies.

The question remains, then, whether St. Paul is an LHWCA carrier for Corn Island. The language of the statute, particularly Section 935, requires analysis of the policy itself to determine whether a carrier provides

coverage under the LHWCA to a company. Therefore, if the policy creates a relationship whereby an insurance company becomes an employer's LHWCA carrier, then that company is subject to the LHWCA as it relates to insurance carriers, including the notice provision set forth in Section 935. Thus, we turn to an analysis of the St. Paul policy to determine if the policy provided Corn Island coverage under the LHWCA.

Initially, though, we pause to clarify the governing law. In this suit where our subject matter jurisdiction is premised on diversity, Indiana's choice of law rules determine the applicable substantive law in this case. *See Sound of Music Co. v. Minn. Mining. & Mfg. Co.*, 477 F.3d 910, 915 (7th Cir. 2007) (citations omitted). Indiana "favors contractual stipulations as to governing law." *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002) (citations omitted). The St. Paul policy states that it "shall be governed by the internal laws of the State of New York in all respects, including matters of interpretation and performance . . . ." Therefore, we apply New York law as stipulated in the policy.

Under New York law, insurance contracts are to be interpreted "based on the specific language of the policies." *State v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985) (citations omitted). "Contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous the terms are to be taken and understood in their plain, ordinary and proper sense." *In re Estates of Covert*, 761 N.E.2d 571, 576-77 (N.Y. 2001) (internal quotation and citations omitted). Policies are construed "in a way that 'affords a fair meaning to all of the language employed by the parties in the con-

tract and leaves no provision without force and effect.'" *Consol. Edison Co. of New York, Inc. v. Allstate Ins. Co.*, 774 N.E.2d 687, 693 (N.Y. 2002) (citations omitted). Extrinsic evidence is permitted only if the contract is ambiguous. *Krystal Investigations & Sec. Bureau, Inc. v. United Parcel Serv., Inc.*, 826 N.Y.S.2d 727, 728 (N.Y. App. Div. 2006) (citations omitted). Against this backdrop then, we consider the terms of the St. Paul policy.

As a bumbershoot policy, the St. Paul policy provides excess coverage for underlying insurance policies. Specifically, the St. Paul policy provides, in relevant part, that St. Paul:

> shall only be liable for the excess of either
>
> (a) The amount(s) of the limit(s) set out in the underlying insurances identified in the attached Schedule of Underlying Insurances (with respect to general average, salvage, salvage charges, and sue and labor expenses, the sum(s) of said expenses actually insured under the underlying policies shall be deemed the amount(s) of said underlying policies), or
>
> (b) $25,000 of the Ultimate Net Loss in respect of each occurrence not covered by said underlying limits (all hereinafter called the "Underlying Limits") and then only up to a further $10,000,000 of the Ultimate Loss in respect of each occurrence . . . .

St. Paul Policy, Insuring Agreement § II.

"Schedule of Underlying Insurances" is defined as "those insurance policies listed on the schedule attached to this Policy." The Schedule lists various policies including the Fremont policy and contains three columns entitled "Coverage," "Company," and "Primary Limits," respec-

tively. The portion of the Schedule relevant for our consideration appears as follows:

| Coverage | Company | Primary Limits |
|---|---|---|
| Workmens Compensation | Freemont Industrial Indemnity Co. (Indiana) | 500,000/ 500,000/ 500,000 |
| Longshoreman/Harbor Workers | JY5294328 (Indiana USL&H) | 500,000/ 500,000/ 500,000 |
| Employers Liability | Expiring 7/22/01 | |

**THE PRIMARY LIMIT OF LIABILITY SHOWN ABOVE IS THE MINIMUM LIMIT REQUIRED BY OUR POLICY REGARDLESS OF ANY SUBLIMIT THAT MAY BE CONTAINED IN THESE PRIMARY POLICIES.**

The St. Paul policy also defines "Ultimate Net Loss" as:

the total sum which the Assured becomes obligated to pay by reason of matters set out in the "Insuring Agreement", Clause I, including compromise settlements, and shall include hospital, medical, and funeral charges and all sums paid as salaries, wages, compensation, fees, charges, and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses, and investigators and other persons, and for litigation, settlement, adjustment, and investigation of claims and suits which are paid

as a consequence of any occurrence covered here-
under, excluding however, the salaries of the Assured's
regular officers and employees and general office
overhead and also excluding in any part of such
expenses for which the Assured is covered by other
valid and collectible insurance.

Corn Island asserts that it is covered by sections II(a)
and (b) of the St. Paul policy because the Schedule pro-
vides coverage in excess of $500,000 for the Fremont policy.
In response, St. Paul argues that its policy does not cover
workers' compensation benefits, including LHWCA
benefits, because the Fremont policy provided full cover-
age for those benefits. To the extent that its policy provides
coverage in excess of Fremont's policy, St. Paul contends
that it applies to Fremont's employer's liability insurance,
which has a maximum coverage of $500,000. In other
words, according to St. Paul, because Fremont provided
unlimited LHWCA coverage, there is no "excess" for its
policy to cover. St. Paul further asserts that coverage is
precluded under its policy because its policy does not
cover claims arising from insolvency, bankruptcy of the
underlying insurer, and failure to maintain underlying
insurance coverage. After setting forth the guiding in-
terpretation principles, we will address whether the
Fremont policy is incorporated into the St. Paul policy.

While neither party claims that the St. Paul policy is
ambiguous, Corn Island objects to St. Paul's reference to
the Fremont policy in interpreting the St. Paul policy
because Corn Island asserts the Fremont policy is not
incorporated by reference. We disagree. The St. Paul policy
expressly states that St. Paul is "liable for the excess of . . .
(a) The amount(s) of the *limit(s) set out in the underlying
insurances* identified in the attached Schedule of Underly-

ing Insurances . . . ." St. Paul Insuring Agreement § II(a)
(emphasis added). The St. Paul policy incorporates the
Fremont policy to ascertain Fremont's limits. If the excess
of the limits triggering St. Paul coverage was based on the
limits set forth in the Schedule, the object of "limit(s) set
out in" would be the Schedule, not the "underlying
insurances." In other words, "limit(s) set out in" modifies
underlying insurance, not the Schedule. For Corn Island's
position to have merit, the St. Paul policy would have had
to state that St. Paul is "liable in excess of . . . (a) The
amount(s) of the *limit(s) set out in the Schedule*." As the
policy is written, though, St. Paul is obligated to provide
coverage in excess of the limits contained in the under-
lying insurance policies, and those insurance policies are
then identified in the Schedule, which also provides the
exact primary limit amounts at which St. Paul starts
providing coverage.

To determine the scope of St. Paul's coverage, then, we
look to the Fremont policy to ascertain Fremont's coverage
areas and corresponding limits. The Fremont policy
contains two parts: one entitled, "Workers Compensation
Insurance," and another entitled, "Employers Liability
Insurance." In addition, it has several endorsements,
including the "Longshore and Harbor Workers' Compensa-
tion Act Coverage Endorsement" ("Endorsement"). The
Endorsement states, in relevant part:

> This endorsement applies to work subject to the
> Longshore and Harbor Workers' Compensation Act
> in a state shown in the Schedule.
>
> . . .
>
> Workers' Compensation Law means the workers or
> workmen's compensation law and occupational disease

law of each state or territory named in Item 3.A. of the Information Page and the Longshore and Harbor Workers' Compensation Act (33 U.S.C. Sections 901-950).

. . .

SCHEDULE

| State | Longshore and Harbor Workers' Compensation Act Coverage Percentage |
|---|---|
| INDIANA | 108% |

Thus, the Fremont policy provides full coverage for Corn Island's obligations under the LHWCA for work in Indiana. Plugging this Fremont coverage limit into section II(a) of the St. Paul policy, we conclude there is nothing in excess for which St. Paul is liable because the Fremont policy provides total coverage for LHWCA claims.[5] An excess policy like St. Paul's provides coverage in excess of what is covered by a primary policy, and when a primary policy, like Fremont's, provides full coverage for particular liabilities there is no excess to cover.[6] Therefore, based on the plain language of the St.

---

[5] The parties do not discuss the 108% designation in the Fremont policy for LHWCA coverage. Certainly, though, it does not provide less than whole and complete coverage.

[6] To the extent that "excess" coverage would be sought in the case of insolvency as occurred with Fremont, the St. Paul policy

(continued...)

Paul policy, and the Fremont policy incorporated by reference, we conclude as a matter of law that the St. Paul policy does not provide LHWCA coverage under Section II(a). Accordingly, St. Paul is not Corn Island's LHWCA carrier under that section of its policy.

Similarly, Section II(b) fails to establish St. Paul as Corn Island's LHWCA carrier. Section II(b) provides limited coverage for "each occurrence not covered by said underlying limits." Again, the Fremont policy is incorporated by reference. The "occurrence" at issue before us is Williams's injuries and the resulting medical care and other benefits provided under the LHWCA. As previously discussed, Williams's injuries are covered by the underlying limit, i.e., Fremont's full LHWCA coverage. Because everything is covered, there is nothing in this occurrence not covered by the underlying limits of the Fremont policy.

Corn Island argues that the St. Paul policy "promises to pay above amounts 'recoverable' from underlying insurers." However, contrary to Corn Island's argument, Section II(b) commits St. Paul to provide limited coverage for 'each occurrence not *covered*, . . . ." Section II(b) does not speak to questions of recoverability. As the Fifth Circuit noted in construing an umbrella policy with the same language as Section II(b) where the primary insurer became insolvent, there is a distinction between coverage and collectibility in instances such as these. *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Aries Marine Corp.*, 932 F.2d 442, 446 (5th Cir. 1991). Section II(b) provides that St. Paul is

---

[6] (...continued)
explicitly states that it "shall not cover liabilities arising by reason of insolvency." St. Paul Insuring Agreement, § I.

obligated to provide coverage for those things not covered by the underlying insurance policies.

> When an excess insurer uses the term "collectible" or "recoverable" it is agreeing to drop down in the event the primary coverage becomes uncollectible or unrecoverable; on the other hand, when an excess insurer uses the term "covered" or "not covered," it is agreeing to drop down only in the event that the terms of the underlying policy do not provide coverage for the occurrence or occurrences in question.

*Id.* at 446-47 (quoting *Mission Nat'l Ins. Co. v. Duke Transp. Co.*, 792 F.2d 550, 552-53 (5th Cir. 1986)). Simply stated, "[w]hen used in this context the terms 'covered' and 'not covered' refer to whether the policy insures against a certain risk, not whether the insured can collect on the underlying policy.' " *Pergament Distrs., Inc. v. Old Republic Ins. Co.*, 513 N.Y.S.2d 467, 468 (N.Y. App. Div. 1987) (citations omitted). Thus, because Section II(b) of St. Paul's policy used the term "cover" and not "collectible" or "recoverable," Section II(b) does not provide Corn Island LHWCA coverage.

Corn Island attempts to overcome the impact of Section II(b) by focusing on the "Ultimate Net Loss" exclusion contained in the St. Paul policy. The Ultimate Net Loss portion of St. Paul's policy excludes coverage of expenses "covered by other valid and collectible insurance." This "valid and collectible" language, Corn Island contends, shows that the St. Paul policy provided coverage for claims that are not "collectible." However, contrary to Corn Island's position, the "Ultimate Net Loss" provision does not establish coverage—it limits coverage. Further, the Section II(b) which defines the excessive coverage only applies for "occurrences not covered." As explained above,

though, the Fremont policy provided full coverage for the
occurrence at issue in this case. Accordingly, St. Paul's
policy does not provide coverage, and the Ultimate Net
Loss exclusion never comes into play.

Because the St. Paul policy does not provide LHWCA
coverage, St. Paul is not Corn Island's LHWCA carrier.
Therefore, the LHWCA's notice provision does not apply,
and New York law governs the question of notice. Under
New York law, the lack of timely notice to an insurer,
without a valid reason for the delay, bars coverage. *See Am.
Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 438 (2d Cir.
1995). Delays of one to two months have been found
unreasonable under New York law. *Id.* at 440 (citations
omitted).

On appeal, Corn Island does not argue that its notice
was timely under New York law, focusing instead on the
LHWCA's notice provision. However, even if contested, we
agree with the district court's holding that Corn Island's
notice to St. Paul was untimely. The accident at
issue occurred in February 2001, and Corn Island notified
St. Paul of the injury three years later in February 2004.
Corn Island provides no justification for the delay in
providing St. Paul notice of the claim, whether for the
three years from the date of the accident or for the five
months from when Corn Island learned from the DOL in
September 2003 that Corn Island was obligated to cover
Williams's expenses. Further, Corn Island does not assert
any public policy that would preclude application of New
York law. *See Schaffert v. Jackson Nat'l Life Ins. Co.*, 687
N.E.2d 230, 234 (Ind. App. 1997) (holding that another
state's law set forth in a choice of law clause would not
apply when the other state's law appears to be "against the
good morals or natural justice, or prejudicial to the general

interests of the citizens of this state." (citation omitted)). Accordingly, Corn Island's claim is barred as a matter of law due to late notice. Moreover, even if Corn Island provided timely notice, as our above analysis demonstrates, St. Paul's policy did not provide coverage for Williams's claims.

### III.

Because the St. Paul policy does not provide LHWCA coverage to Corn Island, St. Paul is not Corn Island's LHWCA carrier. As such, the LHWCA notice provision does not apply and New York law on notice applies in this case. Corn Island's notice to St. Paul of Williams's injury was late as matter of law thereby barring coverage under the St. Paul policy, the terms of which also do not provide coverage for Corn Island's claim. Accordingly, we affirm the district court's grant of summary judgment in favor of St. Paul.

A true Copy:

     Teste:

 

 

                           _____
                           *Clerk of the United States Court of*
                           *Appeals for the Seventh Circuit*