# United States Court of Appeals
## For the First Circuit

No. 21-1144

J-WAY SOUTHERN, INC.,

Plaintiff, Appellant,

v.

UNITED STATES ARMY CORPS OF ENGINEERS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Thompson, Lipez, and Kayatta,
Circuit Judges.

Ian J. Pinta, with whom Christopher Weld, Jr. and Todd & Weld
LLP were on brief, for appellant.
Anne Murphy, Attorney, Appellate Staff, Civil Division, with
whom Nathaniel R. Mendell, Acting United States Attorney, Brian M.
Boynton, Acting Assistant Attorney General, and Charles W.
Scarborough, Attorney, Appellate Staff, Civil Division, were on
brief, for appellee.

May 10, 2022

**THOMPSON, Circuit Judge.** Today, we write primarily for the parties named in this case's caption, and we therefore assume their familiarity with the facts and travel, as well as the issues raised and arguments presented. This allows us to get straight to it, offering the basics and some supplemental information as needed along the way.

This matter arises out of a terminated June 2015 contract for dredging waterways in Menemsha Harbor, Martha's Vineyard -- i.e., moving "sandy material from the channels and anchorage of . . . Menemsha Creek" to Lobsterville Beach via a temporary hydraulic pipeline. J-Way Southern ("J-Way") got this gig after it was the lowest bidder on a United States Army Corps of Engineers ("USACE") solicitation for the dredging work. But J-Way's performance, in USACE's view, was deficient: J-Way did not complete the work within the timeframe set forth in the contract. There was some procedural scuffling regarding J-Way's default on the contract, and, ultimately, USACE terminated the contract.[1] J-

---

[1] A first termination for default was rescinded by USACE after J-Way argued in an administrative claim under the Contract Disputes Act ("CDA") that its delay was excusable, and that was followed by an agreement between J-Way and USACE to proceed. But J-Way again experienced delays and USACE determined the failure to perform was not excusable, and it therefore issued a second termination notice for default. USACE made a demand upon J-Way's performance bond to get the work done, and, thereafter, USACE and J-Way's surety executed a Takeover Agreement that led to a new contractor being procured by the surety. For its part, J-Way eventually (two-plus years after the default termination) submitted another administrative claim under the CDA, arguing the second default

- 2 -

Way filed suit, alleging improper termination and breach of the contract by USACE. In response, USACE moved to dismiss for failure to state a claim. The district court granted USACE's dismissal motion, ruling (as is relevant to our decision today) that J-Way's claims were time-barred. J-Way S., Inc. v. United States, 516 F. Supp. 3d 84, 94 (D. Mass. 2021). J-Way appeals.

After careful de novo review (see, e.g., N.R. by & through S.R. v. Raytheon Co., 24 F.4th 740, 746 (1st Cir. 2022)) of the record, the parties' appellate submissions, and the applicable law, we spy no basis to disturb the district court's decision, which is comprehensive and well-reasoned. And "when lower courts have supportably found the facts, applied the appropriate legal standards, articulated their reasoning clearly, and reached a correct result, a reviewing court ought not to write at length merely to hear its own words resonate." deBenedictis v. Brady-Zell (In re Brady-Zell), 756 F.3d 69, 71 (1st Cir. 2014); see also Vargas-Ruiz v. Golden Arch Dev., Inc., 368 F.3d 1, 2 (1st Cir. 2004) ("[W]hen a trial court accurately sizes up a case, applies the law faultlessly to the discerned facts, decides the matter, and articulates a convincing rationale for the decision, there is no need for a reviewing court to wax longiloquent.").

---

termination was unlawful. No action was taken by USACE on that claim because it understood the claim to be time-barred. That second default termination is the impetus for the instant litigation.

This case fits that mold. We thus affirm substantially on the basis of Judge Saris' thorough decision.

Before we reach our brief discussion of the arguments advanced on this appeal, though, we must pause to have a look at a jurisdictional issue that was much debated below. That debate hasn't been revisited before us on appeal, but "[t]his Court has an independent duty to assess the existence of subject matter jurisdiction." Almeida-León v. WM Cap. Mgmt., Inc., 993 F.3d 1, 11 n.13 (1st Cir. 2021) (citing Espinal-Domínguez v. Puerto Rico, 352 F.3d 490, 495 (1st Cir. 2003)).

## Jurisdiction

When J-Way filed its complaint in district court, it asserted admiralty jurisdiction because the parties' dispute arose out of a maritime contract under the CDA, 41 U.S.C. § 7102(d). Disagreeing with that jurisdictional premise, the government moved to dismiss or transfer for lack of subject matter jurisdiction, arguing, inter alia, that "[t]he contract is a standard Army Corps construction contract, . . . and disputes arising from such contracts have been resolved at specialty government contract appeal boards or in the U.S. Court of Federal Claims for over 150 years." According to the government, its contract with J-Way was "not a maritime contract in whole or in part" -- the contract contemplated "digging earth, not [water] navigation," and thus was "a standard federal construction contract." Indeed, the

- 4 -

government, citing a history of dredging-contract-dispute cases being heard in the Court of Federal Claims, insisted that court, as well as agency boards, have always exercised jurisdiction over matters such as this. J-Way retorted that the dispute did not arise from a construction contract at all; rather, the dispute clearly had its genesis in a maritime contract, with the contract's principal purpose being the traditionally maritime activity of dredging to make a waterway more navigable to promote commerce. Accordingly, J-Way argued, the federal district court in which it had filed its case actually enjoyed exclusive jurisdiction pursuant to 28 U.S.C. § 1333(1) (providing that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction") and the CDA, 41 U.S.C. § 7102(d) (excepting appeals "arising out of maritime contracts" from the jurisdiction of the Court of Federal Claims or the agency boards of contract appeals).

After hearing argument on the issue, the district court denied the motion to dismiss for lack of subject matter jurisdiction, holding that it had admiralty jurisdiction over the dredging contract dispute. J-Way S., Inc. v. United States, 460 F. Supp. 3d 65, 70 (D. Mass. 2020). That decision wasn't appealed.[2]

---

[2] We note that an appeal of that decision wouldn't have landed on our desks; it would've gone to the Federal Circuit pursuant to 28 U.S.C. § 1292(d)(4)(B).

- 5 -

Before us, the government now agrees that "[t]he district court had jurisdiction over this Contract Disputes Act action under 28 U.S.C. § 1333(1), and 41 U.S.C. §§ 7102(d) and 7104(b)." But we are dutybound to probe subject matter jurisdiction nonetheless. We, like the district court, find subject matter jurisdiction exists, and we agree with the district court's reasoning that led to this conclusion. By way of explanation, we borrow extensively from the district court's sound analysis (again, see In re Brady-Zell, 756 F.3d at 71) and pepper that solid reasoning with a few of our own observations.

Generally, the United States Court of Federal Claims has exclusive jurisdiction over contract claims against the U.S. in excess of $10,000, see 28 U.S.C. §§ 1346(a)(2), 1491(a)(1), but the CDA vests admiralty jurisdiction in the federal district courts for lawsuits against the U.S. that "aris[e] out of maritime contracts," 41 U.S.C. § 7102(d).[3] See also 28 U.S.C. § 1333 (providing exclusive federal district court jurisdiction for "[a]ny civil case of admiralty or maritime jurisdiction"); 46

---

[3] 41 U.S.C. § 7102(d) provides:

Maritime contracts. – Appeals under section 7107(a) of this title and actions brought under sections 7104(b) and 7107(b) to (f) of this title, arising out of maritime contracts, are governed by [the Suits in Admiralty Act] or [the Public Vessels Act], as applicable, to the extent that those [Acts] are not inconsistent with this chapter.

U.S.C. § 30906 (instructing that civil actions in admiralty against the U.S. must be brought in federal district court); El-Shifa Pharm. Indus. Co. v. United States, 378 F.3d 1346, 1353 (Fed. Cir. 2004) (noting that 28 U.S.C. § 1333 "grant[s] exclusive and original jurisdiction to federal district courts over civil cases in admiralty and maritime jurisdiction"); Thrustmaster of Tex., Inc. v. United States, 59 Fed. Cl. 672, 673-74 (2004) (observing that exclusive jurisdiction to hear CDA claims regarding maritime contracts lies with the federal district courts).

Whether a contract is a maritime contract is a difficult question given the conceptual (rather than spatial) boundaries of admiralty jurisdiction, Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 23 (2004), and "the answer 'depends upon . . . the nature and character of the contract,'" id. at 24 (alteration in original) (quoting N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., 249 U.S. 119, 125 (1919)). "[T]he true criterion" for making this determination is "whether [the contract in question] has 'reference to maritime service or maritime transactions.'" Id. (quoting Hall Bros., 249 U.S. at 125). Indeed, "the fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce." Id. at 25 (cleaned up) (quoting Exxon Corp. v. Cent. Gulf Lines, Inc., 500 U.S. 603, 608 (1991)).

In view of that interest, a court's inquiry should be focused "on whether the principal objective of a contract is

maritime commerce." Id.; see also P.R. Ports Auth. v. Umpierre-Solares, 456 F.3d 220, 224 (1st Cir. 2006) (describing this inquiry as one focused on "whether the contract 'relate[s] to the navigation, business or commerce of the sea'" (alteration in original) (quoting Cunningham v. Dir., OWCP, 377 F.3d 98, 109 n.11 (1st Cir. 2004))). Because "[w]hile it may once have seemed natural to think that only contracts embodying commercial obligations between the 'tackles' (i.e., from port to port) have maritime objectives, the shore is now an artificial place to draw a line" -- "[m]aritime commerce has evolved along with the nature of transportation and is often inseparable from some land-based obligations." Kirby, 543 U.S. at 25; cf. id. at 27 ("If a [contract]'s sea components are insubstantial, then the [contract] is not a maritime contract.").

The government's argument against the district court's exercise of jurisdiction over the contract dispute boiled down to a customs/historical practice position: Citing cases dating back to 1857, the government observed that the Court of Federal Claims (and its predecessor, the United States Claims Court) have exercised jurisdiction over government dredging contract disputes since that time. But, as the district court explained, "no court has squarely considered whether a government dredging contract is a maritime contract," and "[t]he Supreme Court, the Federal Circuit, and the Court of Federal Claims have all held that they

are 'not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed sub silentio.'" J-Way, 460 F. Supp. 3d at 69 (quoting United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38 (1952), and citing Huston v. United States, 956 F.2d 259, 261 (Fed. Cir. 1992); Red River Holdings, LLC v. United States, 87 Fed. Cl. 768, 796 n.33 (2009)). "The Court of Federal Claims' exercise of jurisdiction over government dredging contract disputes has never been analyzed." Id.

And so, plotting a course through these new waters, the district court deployed that "principal objective" analysis the Supreme Court set out in Kirby, 543 U.S. at 25, to determine whether the contract was a maritime contract such that the district court had jurisdiction over the dredging contract dispute before it. Here's how that went.

"The undisputed purpose of the contract was to dredge a navigable waterway and then deposit sand on a beach." J-Way, 460 F. Supp. 3d at 69 (citing the contract's explanation that "[t]he work of this project will consist of the maintenance dredging of shoaled areas within the existing Federal Navigation Channel"). Dredging a navigable waterway is traditionally a maritime activity, and such a dredging contract facilitates maritime commerce, which anchors maritime jurisdiction. Id. at 69-70 (citing Misener Marine Constr., Inc. v. Norfolk Dredging Co., 594 F.3d 832, 837 (11th Cir. 2010) (concluding that a dredging contract

was a maritime contract because its "primary objective . . . was dredging a navigable waterway," and that "had a direct effect on maritime services and commerce")); see also Weston/Bean Joint Venture v. United States, 123 Fed. Cl. 341, 375 (2015) (observing that the U.S. Army Corps manual defines "maintenance dredging" as "[t]he cyclic dredging of the same area over a period of time to remove accumulating sediments and to maintain ship and barge traffic" (alteration in original)).[4]

The district court was unpersuaded by the government's argument, based on federal regulations referring to dredging as a type of construction, that the principal objective of this contract was construction, rather than maritime commerce -- indeed, the "regulatory description does not determine the jurisdictional question where, as here, the primary objective of the 'construction' was to assist maritime commerce." J-Way, 460 F.

---

[4] And Puerto Rico Ports Authority, 456 F.3d at 225, found a maritime contract when parties entered into it for the purpose of securing removal of a sunken boat from San Juan Harbor's navigable waters since its purpose thus was removing an obstruction to maritime navigation and commerce. See id. (comparing D.M. Picton & Co., Inc. v. Eastes, 160 F.2d 189, 192-93 (5th Cir. 1947) (reasoning that "it would be difficult to imagine a contract more completely maritime" than a contract for removal of materials that were "menaces to navigation," and, accordingly, holding that a claim for breach of contract "to remove hazards to navigation" was within admiralty jurisdiction), with R. Maloblocki & Assocs., Inc. v. Metro. Sanitary Dist., 369 F.2d 483, 485 (7th Cir. 1966) (explaining that the purpose of the dredging contract there was flood control and "any effect the project may have had upon navigability was, at best, incidental," so the contract was not maritime in nature (internal quotation marks omitted))).

Supp. 3d at 70. The district court was similarly unpersuaded by the government's point that substantial portions of the contract's period were meant to be spent on what it viewed as purely non-maritime things, like grading the beach, mobilizing and demobilizing equipment, constructing a temporary land-borne pipeline, and, in doing these things, using equipment that was not vessel-borne. That's all well and good. But no legal support was offered to explain "why these considerations should outweigh the contract's plain language and compensation scheme." Id. Overall, "the contract provisions demonstrate that the primary purpose of the dredging was to facilitate maritime commerce." Id.

And while it was true that the contract's additional objectives included protecting local wildlife and restoring Lobsterville Beach (where the dredged sediment was to be deposited, recall), the government simply had "not produced any evidence from which th[e c]ourt [could] find that those objectives were the primary purpose of the contract" under Kirby's test. Id. "[T]he plain language of the contract indicates that J-Way was paid based on the amount of sediment dredged," and "[t]he contract provided no separate remuneration for depositing the sediment or grading the beach." Id. (citing Kirby, 543 U.S. at 25 (noting that maritime commerce is "often inseparable from some land-based obligations")); see also Kirby, 543 U.S. at 27 ("[A contract's] character as a maritime contract is not defeated simply because it

also provides for some land carriage."). This was driven home by the government's concession "that less time was allocated to grading the beach than to dredging the sediment." J-Way, 460 F. Supp. 3d at 70.

Therefore, the district court concluded that, with "[s]ubstantial portions of the contract . . . dedicated to improving the navigability of a waterway," "[j]urisdiction over this contract dispute properly lies in the federal district court." Id.

And we agree -- this contract is, as the saying goes, of a "genuinely salty flavor." Kirby, 543 U.S. at 22 (quoting Kossick v. United Fruit Co., 365 U.S. 731, 742 (1961) (Harlan, J.)). Its nature and character sound in maritime services, with the contract aimed at protecting and effectuating maritime commerce via the goal of improving navigability of the waterway. See generally id. at 23-25, 27; P.R. Ports Auth., 456 F.3d at 224. Its principal objective was maritime commerce. See Kirby, 543 U.S. at 25. For all of these reasons, the federal district court had jurisdiction over this maritime contract dispute.

## Merits

Jurisdiction navigated, we turn now to the merits.

The CDA, as regulated by the Federal Acquisition Regulations ("FAR"), which govern contracts with the government, specifies that an appeal of a final default decision must be made

to the appropriate agency board within ninety days from the date of its receipt or to the federal court within twelve months from the date of its receipt. See 41 U.S.C. § 7104.[5] J-Way's improper default termination claim wasn't filed within the statutory deadline, and J-Way does not attempt to argue otherwise. Instead, as it argued below, J-Way insists that its claim should not be time-barred because the 2017 termination notice was defective in that it didn't comply with the FAR: It failed to inform J-Way that it was a final decision and referred J-Way only to the contract's disputes clause, which states nothing about the appeals process or J-Way's appellate rights. J-Way argues it detrimentally relied on that fatally flawed notice. What's more, says J-Way, its claim could also be considered timely under the Fulford doctrine, see Fulford Mfg. Co., ASBCA No. 2143, ASBCA No. 2144 (May 20, 1955), since that doctrine extends the time in which a contractor can challenge a default termination if the contractor is assessed reprocurement costs. J-Way's thinking is that, "where

_____

[5] As explained above, the jurisdictional provision of the Suits in Admiralty Act, 46 U.S.C. § 30906, overrides that of the CDA to govern this maritime contract. The Suits in Admiralty Act also provides for a two-year statute of limitations, id. § 30905 -- one year longer than that of the CDA, 41 U.S.C. § 7104(b)(3). In their briefs on appeal, neither party argues that the longer limitations period should govern this maritime contract or would bear on the issue of notice. And J-Way's suit (filed more than two years after the default termination), see J-Way, 460 F. Supp. 3d at 67, would have been untimely even under a two-year limitations period. We therefore express no view on the question.

- 13 -

a surety pays a replacement contractor and then assesses those reprocurement costs against the defaulted contractor," the Fulford doctrine should be extended to apply to that situation as well. J-Way acknowledges no court has actually done what it's asking us to do on this point, but says "it stands to reason that" the doctrine could apply as J-Way wants. And J-Way tells us its other distinct breach of contract claims also are timely -- they don't arise from the default termination and were filed within six years of USACE's independent breaches of the dredging contract.[6] See 41 U.S.C. § 7103(a)(4)(A) (setting a six-year limitations period for contract claims against the government).

As we said when we kicked off today's opinion, the district court thoughtfully dealt with these issues already, concluding that, under the applicable legal framework, all of J-Way's claims are time-barred, and none of J-Way's above-listed arguments against that conclusion persuade. J-Way, 516 F. Supp. 3d at 89-93. We substantially echo the district court's reasoning on each issue. Specifically:

---

[6] J-Way also alleged assigned claims on behalf of J-Way's surety, and the district court had to figure out whether the assignment of the surety's claims to J-Way was invalid. It concluded that the surety could not assign its claims to J-Way. J-Way, 516 F. Supp. 3d at 94. Before us, J-Way does not challenge this aspect of the district court's ruling.

- 14 -

- The second termination notice was missing the required regulatory language, yes.[7] But it provided J-Way with adequate notice nonetheless. It explained J-Way was in default but could appeal pursuant to the contract's disputes clause -- and the disputes clause (which consists of § 52.233-1 of the FAR, as incorporated by reference in the contract) in turn states the contracting officer's decision on a claim is "final unless the Contractor appeals or files a suit as provided in 41 U.S.C. chapter 71" (with § 7104 laying out the ninety-day or twelve-month time limit for appealing). Id. at

_____

[7] The missing regulatory language comes from FAR 33.211(a)(4)(v). Pursuant to 41 U.S.C. § 7103(e), "[t]he contracting officer's decision shall state the reasons for the decision reached and shall inform the contractor of the contractor's rights as provided in this chapter." And the FAR provision instructs that "the contracting officer shall . . . [p]repare a written decision that shall include . . . [p]aragraphs substantially as follows:"

> This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number.

48 C.F.R. § 33.211(a)(4)(v). It also explains that a contractor can "bring an action directly in the United States Court of Federal Claims (except as provided in 41 U.S.C. [§] 7102(d), regarding Maritime Contracts) within 12 months of the date [the contractor] receive[s] th[e] decision." Id.

- 15 -

90-91; see also RMA Eng'g S.A.R.L. v. United States, 140 Fed. Cl. 191, 216 (2018) (finding that a notice of termination was valid under the CDA where the notice stated that the contractor had the right to appeal under the disputes clause). This means that even though the notice omitted the regulatory language, it was not prejudicially defective because it provided J-Way with adequate notice.

- Because we conclude that the notice was not defective from an adequate-notice standpoint, we need not weigh in on J-Way's argument that it detrimentally relied on a defective notice. (That said, we tend to agree with the district court's explanation that J-Way's asserted detrimental reliance was unreasonable because it failed to allege any facts to "support a reasonable belief that the [g]overnment would reconsider the second Termination for Default." J-Way, 516 F. Supp. 3d at 91.)

- Next, we decline to extend the scope of the Fulford doctrine in the novel way J-Way urges us to. The doctrine "allows a contractor to challenge a [g]overnment assessment for excess reprocurement costs by challenging the underlying termination for default, even if a challenge to the termination for default would otherwise be time-barred." Id. at 92 (citing MES, Inc. v. United States, 104 Fed. Cl. 620, 635 (2012)). The purpose of the doctrine is not to allow contractors to

bring untimely claims in the circumstances in which J-Way finds itself, i.e., the government has made no claim for reprocurement costs against J-Way. Id. So J-Way cannot lean on Fulford to resuscitate untimely claims that have nothing to do with excess reprocurement costs.[8]

- And the district court was right that the breach of contract claims are all based on the same set of facts and seek the same relief as the improper termination claim, amounting to impermissible "back-door challenges" to the decision to issue the second default termination notice. Id. at 93 (citing Mil. Aircraft Parts, ASBCA No. 60139, 16-1 BCA ¶ 36390 (June 3, 2016) (declining to field a breach of contract claim in a similar situation, i.e., when the "affirmative claim sets

---

[8] We take this opportunity to explain a bit more about why we decline to extend Fulford to situations in which the government has made no claim against the contractor in default. Aside from what we've just explained, there are several reasons for our rejection of J-Way's invitation to do so: (1) The contractor will know when demand is placed on its surety; indeed the contractor will in most cases of charged default -- as here -- know that there is a risk of reprocurement costs; (2) Appealing or suing within the statutory period is a readily available safe harbor; (3) The risk of engaging in litigation that turns out to have been unnecessary can be mitigated with a standstill or tolling agreement; and (4) If contractors could wait until the surety actually makes demand on the contractor, there would be no final decision by the government to trigger the appeal clock, and the government would lose the ability to secure repose. In so holding, we doubt that we create a trap for the unwary: J-Way was notified at the time of its termination that the government was making a claim on J-Way's performance bond, and should have anticipated that its surety would seek to recoup any excess costs.

- 17 -

forth actions on the part of [the government] . . . that may have constituted [contract] breaches," but the breach of contract claim "is based on the same set of facts, circumstances, and actions preceding the default terminations and is inextricably bound up with the issue of the propriety of those terminations" (alterations in original))).

And so we reject J-Way's arguments against the operation of the time bar and decline to breathe new life into the untimely complaint. All we'll add -- though we think it plenty clear on the face of the district court's decision -- is this. The termination notice bespeaks finality over and over, plus, from the adequate-notice standpoint, it provided the relevant regulatory and statutory breadcrumbs a reader could (and should) follow to find the appellate logistics.[9] There is nothing unreasonable about expecting a company with the benefit of counsel (like J-Way) to follow the sources from one to the other to obtain the appellate

---

[9] No one says the notice provided the required regulatory language -- the government didn't try to, nor could it. In its brief, the government indicates that the notice provided "was technically defective under the FAR, but it contained the critical information necessary for J-Way to appeal." At oral argument, the government tried to walk that back, stating it was not conceding the notice was defective. In any event, we would have echoed the district court's call for the government to "include the specific language provided in FAR 33.211(a)(4)(v) in future notices," J-Way, 516 F. Supp. 3d at 91 n.9, but, as the government explained at oral argument, it has since done exactly that "as a matter of best agency practice."

rights information that is clearly laid out in the disputes clause's provisions. See, e.g., Turner Constr. Co., Inc. v. United States, 367 F.3d 1319, 1321 (Fed. Cir. 2004) (explaining that parties to government contracts are responsible for knowing what laws apply to the contract, "and reasonable professional competence in reading . . . contracts is presumed"). The government met its obligation to inform J-Way of its rights by giving adequate notice.

## Conclusion

The district court's order granting the government's motion to dismiss is **affirmed**. Each side shall bear its own costs.