**M.E.S., INC., Plaintiff,**

and

**Travelers Casualty & Surety Company of America, Plaintiff–Intervenor,**

v.

**The UNITED STATES, Defendant.**

**No. 10–92.**

United States Court of Federal Claims.

May 23, 2012.[1]

---

On May 18, 2012, the court forwarded a sealed copy of this Memorandum Opinion And Order to the parties to redact any information considered to be confidential and/or privileged, and note any typographical errors requiring correction. None of the parties have requested any redactions.

Michael H. Payne, Cohen, Seglias, Pallas, Greenhall & Furman PC, Philadelphia, Pennsylvania, Counsel for Plaintiff.

David C. Dreifuss, Dreifuss, Bonacci & Parker LLP, Florham Park, New Jersey, Counsel for Plaintiff–Intervenor.

David Frank D'Alessandris, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

2. The relevant facts were derived from: Plaintiff's December 8, 2011 Proposed Findings of Uncontroverted Fact ("Pl. PFUF ¶___"), and attached Exhibits (PX 1–42); the documents in the appendix of the Government's January 9, 2012 Opposition To Plaintiff's Motion For Summary Judgment ("DX 1 at A1–50"); additional exhibits attached to Intervenor's October 3, 2011

## MEMORANDUM OPINION AND ORDER

BRADEN, Judge.

### I. RELEVANT FACTS.[2]

On July 20, 1998, the United States Postal Service ("USPS") issued Solicitation Number 332495–98–A–0136 for proposals to construct a new postal facility in Riverhead, New York (the "Riverhead Project"). PX 1. On August 11, 1998, M.E.S., Inc. ("MES" or "Plaintiff"), acquired Performance Bond No. 73 SB 103097863 BCM (the "Performance Bond") from Travelers Casualty & Surety Company of America ("Travelers"). Pl. PFUF ¶ 4; PX 3. The Performance Bond "firmly bound" Travelers to the USPS in the sum of up to $3,954,000.00, to be paid to the USPS unless all of MES' obligations under the contract were met. PX 3.

On September 10, 1998, the USPS awarded Contract No. 332495–98–B–0307 to MES for the Riverhead Project in the amount of $3,954,000 ("the September 10, 1998 Contract"). PX 2. On October 6, 1998, Plaintiff received a Notice to Proceed issued by the USPS, that fixed the completion date of the Riverhead Project as August 2, 1999. Pl. PFUF ¶ 5; PX 4.

On June 2, 1999, the USPS terminated the September 10, 1998 Contract for default because MES allegedly failed to adhere to scheduling duties and requirements, causing a four and one-half month delay in project completion. PX 5. On June 10, 1999, the USPS forwarded a copy of the June 2, 1999 Termination Notice to Travelers and requested that it complete the Riverhead Project, as required by the Performance Bond. IX F. On or around October 1, 1999, Travelers declined to take over the project on the expedited basis requested by USPS. PX 30.

Response To Motion To Dismiss ("IX A–W"); and the USPS's March 1, 2010 Complaint in a related lawsuit in the United States District Court for the Eastern District of New York ("USPS Compl.") (attached to Intervenor's July 14, 2011 Complaint–In–Intervention ("Int. Compl.") as Exhibit B thereto).

At the time of termination, *i.e.*, June 2, 1999, a report prepared by LiRo Engineer & Construction Management, P.C., the USPS's engineering consultant, indicated that $2,891,086 of funds had not yet been paid to MES and were still available to complete the Riverhead Project on budget. Pl. PFUF ¶ 8; PX 7 at 5.

On August 5, 1999, the USPS met with MES to discuss rescinding the termination for default and/or settling USPS's potential liability to MES. Pl. PFUF ¶¶ 21–25; PX 19–22. These negotiations failed. PX 25. An August 26, 1999 letter from the USPS Contracting Officer (the "CO") reported that he expected that "$2,800,000.00 would be required to complete all work [on the Riverhead Project]." PX 26.

On October 12, 1999, the CO informed Travelers and MES that the USPS intended to reprocure the Riverhead Project to ensure timely completion. PX 30.

On October 19, 1999, Plaintiff appealed the USPS's June 2, 1999 decision to terminate the September 10, 1998 Contract for default to the USPS Board of Contract Appeals ("PSBCA"). Pl. PFUF ¶ 30; PX 29. On November 10, 1999, Travelers informed the USPS that it would not take over the Riverhead Project while the PSBCA appeal was pending. PX 42; IX G.

On November 6, 2001, Plaintiff submitted a certified claim to the CO "requesting compensation for change order work, differing site conditions, delay, additional office and site work, and payment of damages for defective specifications and actions by the USPS." Compl. ¶ 10; CM/ECF Doc. No. 49 (the certified claim). On November 26, 2001, the CO deferred consideration of MES' certified claim until the PSBCA ruled on MES' pending appeal. Compl. ¶¶ 12–13.

On July 7, 2003, the USPS again notified Travelers that it intended to reprocure the Riverhead Project and would seek reimbursement from Travelers under the Performance Bond for any costs incurred that exceeded the September 10, 1998 Contract price. USPS Compl. ¶ 27.

On August 25, 2003, Travelers responded that it would not consider any claim under the Performance Bond unless the PSBCA determined that MES' termination for default was lawful. USPS Compl. ¶ 28.

An August 1, 2003 USPS document entitled "Decision Analysis Report" explained:

> The contractor appealed to convert the termination for default to convenience on October 10, 1999. The hearing was not held until February 2001. In the interim, the Bonding Company refused to continue work with another contractor, siding with the terminated contractor. Under advisement of counsel, the Postal Service Contracting Officer did not proceed to re-procure the construction during that time. A final decision by the [PSBCA] has been pending since September 2001, but all indications are that it will be resolved in the favor of the contractor. The Postal Service expects the award to be significantly less than the contractor's claim for $3.9 million. Since re-procurement will no longer prejudice the case, the Postal Service wants to re-start construction.

PX 31 at 1.

Other than requesting that Travelers assume performance of the Riverhead Project, the USPS did not take any other action to reprocure between the June 2, 1999 termination for default and April 26, 2004. Pl. PFUF ¶ 10.

On April 26, 2004, the USPS issued Solicitation No. 332495–04–A–0069 to reprocure the remainder of the Riverhead Project. Pl. PFUF ¶ 33; PX 32. On July 16, 2004, the USPS awarded a contract to THC Realty Development ("THC") for $4,914,000. Pl. PFUF ¶ 37; PX 36. As reprocured, the Riverhead Project was amended to account for "changes in codes and Postal standards," as well as certain "betterments." PX 42.

From the USPS's June 2, 1999 termination of the September 10, 1998 Contract for default to July 16, 2004, the USPS did not take any measures to protect the project site from deterioration. PX 33 at 24. Subsequently, the USPS determined that site deterioration costs were approximately $292,112. PX 42 (USPS estimate in the CO's Feb. 19, 2009 Final Decision); PX 8 at 2 (Nov. 1, 2008 USPS consultant's report reaching same fig-

ure). *Compare* DX 1 at A19 (Government's expert's litigation report, estimating deterioration costs as $230,237).

In addition, the USPS estimated that the reprocured contract reflected $668,619 of "[c]ost escalation," owing to increased wages and materials costs. PX 42 (USPS estimate in the CO's Feb. 19, 2009 Final Decision); PX 8 at 2 (Nov. 1, 2008 USPS consultant's report reaching same figure). *Compare* DX 1 at A19 (Government's expert's litigation report, estimating cost escalation at $618,669). Finally, the reprocured contract included an estimated $327,827 for "changed work" and $77,737 for "betterments" ordered by the USPS. PX 42 (USPS estimate in the CO's Feb. 19, 2009 Final Decision); PX 8 at 2 (Nov. 1, 2008 USPS consultant's report reaching same figure). *Compare* DX 1 at A 19 (Government's expert's litigation report, estimating $355,067 for change costs and $23,014 for betterments).

On June 4, 2005, THC completed the Riverhead Project. Pl. PFUF ¶ 40; PX 38.[3] On September 27, 2006, the USPS made a final payment to THC. PX 42.

On January 31, 2006, the PSBCA denied MES' August 16, 1999 appeal of the USPS's decision to terminate for default. *See In re M.E.S., Inc.*, PSBCA No. 4462, 06–1 BCA ¶ 33,184, 2006 WL 1064175 (Jan. 31, 2006) (reproduced at PX 39). The PSBCA determined that the CO should have granted Plaintiff additional time to complete the Riverhead Project because of delays attributable to USPS, but the maximum permissible extension was 78 days. *Id.* at 32–33. Since Plaintiff's performance was overdue by 4 months at the time of termination, the PSBCA determined that the CO reasonably terminated the September 10, 1998 Contract, because a 78–day extension would have left Plaintiff "more than a month short of timely completion[.]" *Id.* at 33.

On November 1, 2006, the PSBCA denied MES' request for reconsideration of its January 31, 2006 decision. *See In re M.E.S., Inc.*, PSBCA No. 4462, 06–2 BCA ¶ 33,430, 2006 WL 3085742 (Nov. 1, 2006) (reproduced at PX 40).

On September 27, 2007, the United States Court of Appeals for the Federal Circuit affirmed the PSBCA's January 31, 2006 decision in a summary, nonprecedential, *per curiam* opinion. *See M.E.S., Inc. v. Potter*, 240 Fed.Appx. 871 (Fed.Cir.2007) (unpublished).

On February 19, 2009, the CO issued a Final Decision "with respect to the excess reprocurement costs associated with the [Riverhead Project,]" finding that the USPS was entitled to excess reprocurement costs in the amount of $803,909. Pl. PFUF ¶¶ 46, 47; PX 42.

## II. PROCEDURAL HISTORY.

On February 16, 2010, Plaintiff filed a Complaint in the United States Court of Federal Claims ("Compl."), challenging the CO's February 19, 2009 Final Decision, (Compl. ¶¶ 23–27), and seeking $1,223,978 for damages incurred in performing the Riverhead Project, *i.e.*, the "additional costs for change order work, differing site conditions, delay, additional office and site work, equipment and materials, and other damages due to defective specifications and actions of the USPS." Compl. ¶ 33.[4]

On May 19, 2010, the Government filed an Answer And Counterclaim in the United States Court of Federal Claims to recover $803,909 in excess reprocurement costs from Plaintiff.

On January 6, 2011, the court granted the Government's January 5, 2011 Unopposed Motion For Protective Order.

On February 21, 2011, Travelers filed a Motion For Leave To Intervene, but did not

---

3. The Government did not object to PFUF ¶ 40, (Gov't PFUF Resp. at 12–13), which states that performance was substantially complete on June 4, 2005, but the proper date may be June 24, 2006. *See* PX 42 (CO's Final Determination on reprocurement costs stating that substantial completion occurred on June 24, 2006).

4. On March 1, 2010, the USPS filed a related Complaint in the United States District Court for the Eastern District of New York, alleging that Travelers breached its obligations under the Performance Bond and seeking to recover excess reprocurement costs. *See United States Postal Serv. v. Travelers Cas. & Sur. Co. of Am.*, No. 10–00892, CM/ECF Doc. No. 1 (reproduced at IX B).

include a Complaint–In–Intervention as required by RCFC 24(c). In addition, on February 21, 2011, Travelers and MES filed identical Motions For Preliminary Injunction And Temporary Restraining Order to enjoin the United States District Court for the Eastern District of New York from proceeding with the related case filed by the USPS. On March 10, 2011, the Government filed Responses to all three Motions. On March 21, 2011 Travelers and Plaintiff each filed a Reply.

On June 30, 2011, the court issued a Memorandum Opinion And Order granting Travelers' February 21, 2011 Motion For Leave To Intervene. *See M.E.S., Inc. v. United States,* 99 Fed.Cl. 239, 243–44 (2011) ("*M.E.S. I* "). Therein, the court made several rulings. First, the court determined that Travelers had " 'an interest relating to the property or transaction that is the subjection of [this] action' " in light of "Travelers' potential obligation under the Performance Bond." *Id.* at 244 (quoting RCFC 24(a)(2)). Second, the court determined that Plaintiff could not adequately represent Travelers' interests because "Travelers [rather than MES] would potentially be obligated to pay the excess reprocurement costs sought in the Government's counterclaim." *Id.* Third, the court determined Travelers' February 21, 2011 Motion For Leave To Intervene was timely, despite being filed more than a year after the February 16, 2010 Complaint. *Id.* at 243–44. Fourth, the court determined that the potential prejudice to Travelers of being unable to defend against bondholder liability outweighed any prejudice to USPS. *Id.* at 243–244. Fifth, the court determined that it had ancillary jurisdiction over Travelers' potential claims. *Id.* at 244. Finally, the court determined that Travelers' failure to attach a " 'pleading that sets out the claim or defense for which intervention is sought,' " as required by RCFC 24(c), was a harmless procedural defect. *Id.* at 244 n. 7 (quoting RCFC 24(c)). Therefore, the court ordered Travelers to file a Complaint–In–Intervention, pursuant to RCFC 24(c), no later than July 14, 2011. *Id.*

On July 14, 2011, Travelers filed a Complaint–In–Intervention, detailing four separate causes of action, all of which seek a declaration "compelling MES to turn over and pay to Travelers any affirmative recovery in the within action, to the extent of Travelers' bond losses[.]" Int. Compl. ¶¶ 34(b), 38(b), 42(a), 47(b). Count I seeks a declaration that "in the event of an affirmative recovery by MES in [this] action, the [USPS] is barred from recovering money damages against Travelers in connection with the alleged excess reprocurement costs associated with the Project[.]" Int. Compl. ¶ 34(a). In the alternative, Count II seeks a declaration that "in the event of an affirmative recovery by MES in [this] action, the claims alleged against Travelers by the [USPS], with respect to the alleged excess reprocurement costs associated with the Project, are subject to set-off to the extent of any such affirmative recovery by MES." Int. Compl. ¶ 38(a). Count III seeks a declaration "compelling MES to pay into Court any remaining balance on MES' affirmative recovery in the within action, to be held for the benefit of Travelers as a set-off against any potential award in favor of the Eastern District Action [sic][.]" Int. Compl. ¶ 42(b). Count IV seeks a declaration that "in the event of an affirmative recovery by MES as against the [USPS] in [this] action, the claims alleged against Travelers by the [USPS], with respect to the alleged excess reprocurement costs associated with the [Riverhead] Project, are subject to set-off to the extent of any such affirmative recovery by [the USPS]." Int. Compl. ¶ 47(a).

On August 4, 2011, Plaintiff filed a Motion To Dismiss The [July 14, 2011] Complaint–In–Intervention Or, In The Alternative, Motion To Strike The Affirmative Requests For Relief Contained Therein ("Pl. MTD"), arguing: Travelers' July 14, 2011 Complaint impermissibly exceeds the scope of intervention granted by the court's June 30, 2011 Memorandum Opinion And Order; and/or the court lacks subject matter jurisdiction to adjudicate the claims asserted in the Complaint–In–Intervention. Pl. MTD at 7–10. In the alternative, Plaintiff requests that Travelers' requests for affirmative judgment in the July 14, 2011 Complaint–In–Intervention should be stricken pursuant to RCFC 12(f). Pl. MTD at 10–11.

On August 31, 2011, the Government also filed a Motion To Dismiss Travelers' Complaint–In–Intervention ("Gov't MTD"), reciting similar grounds. Gov't MTD at 1, 4–9.

On October 3, 2011, Travelers filed a Memorandum Opposing Motions To Dismiss Travelers' [July 14, 2011] Intervenor Complaint ("Int. MTD Op."), arguing that the court's June 30, 2011 Memorandum Opinion And Order determined that the court had ancillary jurisdiction over all of the claims asserted therein. Int. MTD Op. at 4–15.

On November 21, 2011, Plaintiff and the Government each filed a Reply to Intervenor's October 3, 2011 Memorandum ("Pl. MTD Reply", "Gov't MTD Reply").

Meanwhile, on or about September 20, 2011, while briefing was proceeding on the two Motions To Dismiss the July 14, 2011 Complaint–In–Intervention, Travelers and the USPS agreed to settle Travelers' suit in the Eastern District of New York, although as of October 13, 2011, final approval of the settlement by the Department of Justice was still pending. Int. MTD Op. at 7 (advising that Travelers "has agreed to make a payment to the [USPS] to settle the Eastern District Action[.]"). On October 13, 2011 the United States District Court for the Eastern District of New York dismissed the E.D.N.Y. Lawsuit, subject to reinstatement within 90 days if final approval of the settlement by the Department of Justice was not forthcoming. A copy of the relevant filings was filed with this court on March 9, 2012. *See* CM/ECF Doc. No. 47; Doc. No. 47, Ex. B. Because Travelers' liability in that suit has been resolved, Counts I and II of the July 14, 2011 Complaint–In–Intervention, both of which seek declarations regarding Travelers' potential liability in the E.D.N.Y. Lawsuit, became moot. Accordingly, on March 9, 2012, Travelers voluntarily dismissed Counts I and II, pursuant to RCFC 41(a)(1). CM/ECF Doc. No. 48.

On December 8, 2011, Plaintiff also filed a Motion For Summary Judgment regarding the Government's May 19, 2010 counterclaim for excess reprocurement costs ("Pl. MSJ"). On the same day, Plaintiff filed Proposed Findings Of Uncontroverted Fact and supporting exhibits. Plaintiff argues that the Government's May 19, 2010 counterclaim is barred by the Contract Disputes Act's six-year statute of limitations. Pl. MSJ at 4–11. In the alternative, Plaintiff argues that the Government's May 19, 2010 counterclaim must be dismissed because of the USPS's failure to mitigate its costs by reprocuring in a timely manner. Pl. MSJ at 11–16.

On January 9, 2012, the Government filed a Response To Plaintiff's December 8, 2011 Motion For Summary Judgment ("Gov't MSJ Resp.") and a Response To Plaintiff's Proposed Findings Of Uncontroverted Facts ("Gov't PFUF Resp."). On January 26, 2012, Plaintiff filed a Reply ("Pl. MSJ Reply").

Plaintiff's August 4, 2011 Motion To Dismiss, the Government's August 31, 2011 Motion To Dismiss, and Plaintiff's December 8, 2011 Motion For Summary Judgment are now all pending adjudication by the court.

## III. JURISDICTION.

The jurisdiction of the United States Court of Federal Claims is established by the Tucker Act. *See* 28 U.S.C. § 1491 (2006). The Tucker Act authorizes the court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages.... [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages. *See Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir.2005) (*en banc*) ("The Tucker Act itself does not create a substantive cause of action; in order to come within

the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages."). The burden of establishing jurisdiction falls on the plaintiff. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (holding that the burden is on the plaintiff to allege facts sufficient to establish jurisdiction); *see also* RCFC 12(b)(1).

■ Congress also conferred upon the United States Court of Federal Claims jurisdiction to afford equitable relief, but only "as an incident of and collateral to" a money judgment. *See* 28 U.S.C. § 1491(a)(2). Accordingly, the United States Court of Federal Claims has ancillary jurisdiction over certain claims asserted by intervening parties, even if the court would not have independent jurisdiction over an intervenor's claim. *See M.E.S. I*, 99 Fed.Cl. at 244. The United States Court of Federal Claims, however, "has no power to grant affirmative nonmonetary relief[,] unless it is tied and subordinate to a money judgment." *James v. Caldera*, 159 F.3d 573, 580 (Fed.Cir.1998) (quotation marks omitted).

In this case, the issue of whether the court has jurisdiction to adjudicate the claims alleged in the Intervenor's July 14, 2011 Complaint–In–Intervention is discussed more fully below.

■ The mandatory requirements of the Contract Disputes Act, Pub.L. No. 95–563, 92 Stat. 2383 (1978) ("CDA") (codified at 41 U.S.C. §§ 601–13 (2006)),[5] must also be satisfied before the court has jurisdiction to adjudicate claim, filed either by a contractor or the United States, involving a procurement contract. Accordingly, a complaint alleging a violation of the CDA must cite evidence of a written and certified claim to the CO and a final decision or "deemed denial" by the CO, as a prerequisite to subject matter jurisdiction being afforded to the United States Court of Federal Claims. *See M. Maropakis*

*Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed.Cir.2010) (holding that CDA jurisdiction "requires both a valid claim and a contracting officer's final decision on that claim"); *see also B.D. Click Co. v. United States*, 1 Cl.Ct. 239, 241 (1982) ("The plaintiff [must] produce or cite ... evidence establishing either that it submitted a written claim to the contracting officer or that the contracting officer rendered a final decision."). Although the CDA does not define the term "claim," the United States Court of Appeals for the Federal Circuit has defined it in other contexts as a " 'written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain[.]' " *England v. Swanson Grp., Inc.*, 353 F.3d 1375, 1380 (Fed.Cir.2004) (quoting 48 C.F.R. § 2.201). For claims over $100,000, the failure of a federal contracting entity to "issue a decision" or "notify the contractor of the time within which a decision will be issued," within sixty days of receipt of the claim is "deemed to be a decision by the contracting officer denying the claim[.]" 41 U.S.C. § 605(c)(2), (5) (2006). For claims over $100,000, Congress also requires that "the contractor ... certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the [G]overnment is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor." 41 U.S.C. § 605(b)(1) (2006). In addition, any CDA claim filed either by a contractor or the Government must "be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 605(a).

■ In the February 16, 2010 Complaint, Plaintiff alleged, and the Government does not contest, that it submitted a certified claim to the CO on November 6, 2001. Compl. ¶ 10; *see also* CM/ECF Doc. No. 49 (certified claim). The CO issued a Final

---

5. As of January 4, 2011, Congress amended certain provisions of the CDA and recodified it, as amended, at 41 U.S.C. §§ 7101–7109. *See* Public Contracts Act of Jan. 4, 2011, Pub.L. No. 111–350, § 3, 124 Stat. 3677, 3816–26 (2011). Although the Public Contracts Act repealed 41

U.S.C. §§ 601–13, Congress retained the court's jurisdiction to adjudicate any "rights and duties that matured, penalties that were incurred, and proceedings that were begun before the date of enactment of this Act." *See* Pub.L. No. 111–350, § 7, 124 Stat. at 3855.

Decision assessing excess reprocurement costs against Plaintiff on February 19, 2009. Compl. ¶ 22; PX 42. Although that decision does not state that it is a Final Decision regarding Plaintiff's affirmative claims for changed work orders and differing site conditions (*see* PX 42), the court construes it as a denial of Plaintiff's affirmative claim, since the Government has not suggested otherwise. Moreover, even if the CO's February 19, 2009 Final Decision did *not* deny Plaintiff's November 6, 2001 certified claim, the court considers Plaintiff's affirmative claims as constructively denied in light of the fact that Plaintiff requested a decision from the CO on November 6, 2001, and none has been forthcoming. *See* 41 U.S.C. § 605(c)(5). Accordingly, the court has jurisdiction to adjudicate the claims alleged in the February 16, 2010 Complaint.

Whether the Government's counterclaim complies with the jurisdictional requirements of the CDA, and the court's jurisdiction thereunder, is discussed below.

## IV. DISCUSSION.

### A. Plaintiff's August 4, 2011 And The Government's August 31, 2011 Motions To Dismiss The July 14, 2011 Complaint–In–Intervention.[6]

#### 1. Plaintiff's Argument.

Plaintiff's August 4, 2011 Motion requests that the court dismiss Travelers' July 14, 2011 Complaint–In–Intervention, pursuant to RCFC 12(b)(1), or, in the alternative, strike the affirmative requests therein, under RCFC 12(f). Pl. MTD at 1.

Plaintiff argues that Travelers' July 14, 2011 Complaint–In–Intervention alleges claims that are inconsistent with the court's June 30, 2011 Memorandum Opinion And Order. Pl. MTD at 7–9. Travelers' February 21, 2011 Motion To Intervene stated that "Travelers' and MES' goals have similar components and *are not in conflict with each other* [.]" Mot. To Intervene, CM/ECF Doc.

No. 31 at 7 (emphasis added). Therefore, the court's June 30, 2011 Memorandum Opinion And Order was premised on Travelers' representation that its interest in this litigation was limited to "[potential] liability under the Performance Bond." *M.E.S. I*, 99 Fed.Cl. at 242. The remaining Counts III and IV of Travelers' July 14, 2011 Complaint, however, seek an order " 'compelling MES to turn over and pay to Travelers any affirmative recovery in the within action[.]' " Int. Compl. ¶¶ 34(b), 38(b), 42(a), 47(b).

Travelers, however, no longer has that legally protectable interest, because of the October 13, 2011 settlement of the E.D.N.Y. Lawsuit that resolved Travelers' liability under the Performance Bond. Pl. MTD Reply at 6.[7] Since that interest was the sole basis of Travelers' intervention, the July 14, 2011 Complaint–In–Intervention should be dismissed, pursuant to RCFC 12(h)(3). Moreover, the court's ancillary jurisdiction to determine an intervenor's rights with respect to a government contract does not extend affirmatively to interpreting the scope of a Performance Bond, a private agreement between Plaintiff and Travelers. Pl. MTD at 9–10; Pl. MTD Reply at 6–8.

#### 2. The Government's Argument.

The Government "generally agree[s] with [Plaintiff's August 4, 2011 Motion To Dismiss], but provide[s] additional argument and jurisdictional bases for dismissal" of Travelers' July 14, 2011 Complaint–In–Intervention. Gov't MTD at 2. The Government argues that all claims asserted in Travelers' July 14, 2011 Complaint–In–Intervention request the court to "adjudicate the rights of Travelers with regard to M.E.S." *Id.* at 4. But, the United States Court of Federal Claims lacks subject matter jurisdiction to entertain claims between private parties. *Id.* As an Article I court, the United States Court of Federal Claims only has jurisdiction to adjudicate claims involving *public* rights. *See Northern Pipeline Constr. Co. v. Mara-*

---

**6.** Since Travelers voluntarily dismissed Counts I and II of the July 14, 2011 Complaint–In–Intervention on March 9, 2012, the court restricts its analysis to the parties' discussion of Counts III and IV.

**7.** This argument is only raised in Plaintiff's November 21, 2011 Reply Brief, because settlement occurred after Travelers filed its July 14, 2011 Complaint–In–Intervention and October 3, 2011 Response.

*thon Pipe Line Co.,* 458 U.S. 50, 69–70, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) ("[A] matter of public rights must at a minimum arise between the government and others. In contrast, the liability of one individual to another under the law as defined is a matter of private rights. Our precedents clearly establish that *only* controversies in the former category may be removed from Article III courts and delegated to legislative courts or administrative agencies for their determination." (citations and internal quotation marks omitted)); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 53, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) ("[I]f a statutory cause of action ... is not a 'public right' for Article III purposes, then Congress may not assign its adjudication to a specialized non-Article III court lacking 'the essential attributes of the judicial power.' " (quoting *Crowell v. Benson,* 285 U.S. 22, 51, 52 S.Ct. 285, 76 L.Ed. 598 (1932))). Moreover, the United States Court of Federal Claims' ancillary jurisdiction only "allows the [c]ourt to entertain claims by *parties* that do not meet jurisdictional requirements of the court," but it does not permit the court to adjudicate "*claims* that are beyond the jurisdiction of the [c]ourt." Gov't MTD Reply at 2.

Contrary to Travelers' suggestion, the July 14, 2011 Complaint–In–Intervention does not ask the court to determine whether Travelers or Plaintiff is the owner of a "public right" to recover under the September 10, 1998 Contract. Gov't MTD Reply at 3–5. Instead, Count III specifically seeks an order "compelling MES to turn over and pay to Travelers any affirmative recovery ... [and] compelling MES to pay into Court any remaining balance on MES' affirmative recovery ... as a set-off against any potential award in favor of the Eastern District Action [sic]." Int. Compl. ¶¶ 42(a)-(b). Thus, Count III "does not seek a determination as to the proper payee," but "seeks a determination as to a private dispute between Travelers and M.E.S." Gov't MTD Reply at 5. Count IV reaches even further and "ask[s] this [c]ourt to resolve rights *regarding litigation before a Federal District Court.*" Gov't MTD Reply at 4 (citing Int. Compl. ¶ 47 (requesting the court to "declar[e] that, in the event of an affirmative recovery by MES ... [in this

action], the claims alleged against Travelers by the [USPS] ... [in the E.D.N.Y. Lawsuit] are subject to set-off to the extent of any such affirmative recovery by the [USPS]")).

The Government also argues that the court did not decide this matter in *M.E.S. I.* Gov't MTD Reply at 2. Because Travelers' February 21, 2011 Motion For Leave To Intervene was deficient and did not include a complaint-in-intervention, as required by RCFC 24(c), "there was no way that the [c]ourt could have determined that it possessed jurisdiction over Travelers' claims." Gov't MTD Reply at 2 (quotation marks omitted). Thus, Travelers' cannot rely on the "law of the case" doctrine. *Id.*

In addition, the Government argues that the court does not have jurisdiction to adjudicate Travelers' fourth cause of action, because it impermissibly seeks declaratory relief. Gov't MTD at 5–8. The United States Court of Federal Claims only has jurisdiction to issue declaratory relief in claims brought under the CDA. Gov't MTD at 6–7. Travelers, however, did not submit a claim to the CO for a final decision, so it did not meet the CDA's jurisdictional prerequisites. *Id.* at 7. Moreover, Travelers is not a government "contractor," and the "provisions [of the CDA] apply only to those who are 'contractors' within the meaning of the CDA[.]" *Winter v. FloorPro, Inc.,* 570 F.3d 1367, 1369 (Fed.Cir.2009).

Finally, the claims alleged by Travelers' July 14, 2011 Complaint–In–Intervention are all barred, as they raise new issues. Gov't MTD at 8–9. The United States Supreme Court long ago established a prudential rule that an intervenor "is not permitted to enlarge those issues or compel an alteration of the nature of the proceeding." *Vinson v. Washington Gas Light Co.,* 321 U.S. 489, 498, 64 S.Ct. 731, 88 L.Ed. 883 (1944). Since Plaintiff's February 16, 2010 Complaint did not seek any declaration of Plaintiff's rights vis-à-vis Travelers, Counts III and IV exceed the scope of the proceeding by raising new issues. Gov't MTD at 8–9.

### 3. Intervenor's Response.

Travelers responds that the court has determined it may intervene, so the pending

motions must be denied under the law-of-the-case doctrine. Int. MTD Op. at 4. The July 14, 2011 Complaint–In–Intervention "in no way deviates from the claims and/or defenses asserted in its motion papers or violates [the June 30, 2011 Memorandum] Opinion and Order." *Id.* at 13. The "[c]ourt neither expressly nor implicitly limited the scope of Travelers' intervention solely to defending against the [USPS's] counterclaim for excess reprocurement costs." *Id.* at 14. Furthermore, MES is estopped from opposing Travelers' intervention because counsel for MES previously filed Travelers' February 21, 2011 Motion For Leave To Intervene.[8] *Id.* at 4 & 4 n. 1.

Travelers also rejects Plaintiff's and the Government's contention that the July 14, 2011 Complaint–In–Intervention asserts claims over which the court does not have jurisdiction. Int. MTD Op. at 5–8. Travelers does not ask the court to adjudicate a question of private rights, but to determine whether Travelers or Plaintiff is the correct party to receive any funds that the court may determine the Government owes for a breach of contract. *See Am. Renovation and Const. Co. v. United States,* 65 Fed.Cl. 254, 259–60 (2005) (determining that the United States Court of Federal Claims has jurisdiction to interpret an agreement between private parties in order to determine the ownership of a public right that constitutes the core controversy of a case). Therefore, "the [c]ourt is not being asked to determine liability between private parties; it is being asked to determine whether M.E.S. or Travelers . . . or both . . . are entitled to recover the funds which M.E.S. alleges are due from the Postal Service." Int. MTD Op. at 6 (citing *Great Am. Ins. Co. v. United States,* 397 F.2d 289 (Ct.Cl.1968)). The July 14, 2011 Complaint–In–Intervention "sets forth Travelers' rights of equitable subrogation and its rights under the Indemnity Agreement [with Plaintiff], both of which trigger Travelers' entitlement to recover any funds recovered from the Postal Service to the extent of Travelers' losses." *Id.* at 14. Thus, any adjudication of private rights necessary to accomplish this task is appropriate under the doctrine of

ancillary jurisdiction which rests on "considerations of judicial economy and fairness[.]" *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 617 n. 14, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

Likewise, Travelers argues that it is not seeking declaratory relief. Int. MTD Op. at 8–9. Although the July 14, 2011 Complaint–In–Intervention states that it seeks a "declaration," the court should look to "the substance of [a] claim rather than terminology or draftsmanship[.]" *Hartle v. United States,* 18 Cl.Ct. 479, 483 n. 6 (1989). Substantively, Travelers requests the court to determine the ownership of the public right to recover from the USPS for alleged breaches of the September 10, 1998 Contract. Int. MTD Op. at 9.

### 4. The Court's Resolution.

■ The court agrees with Plaintiff and the Government that Travelers' July 14, 2011 Complaint–In–Intervention exceeds the scope authorized in *M.E.S. I.* Specifically, Travelers' February 21, 2011 Motion To Intervene represented that its goals were "not in conflict with [MES']." Mot. To Intervene, CM/ECF Doc. No. 31 at 7. Therefore, the court determined that Travelers was entitled to intervene, "because of Travelers' potential obligation under the Performance Bond" and the fact that "Travelers would potentially be obligated to pay the excess reprocurement costs sought in the Government's counterclaim." *M.E.S. I,* 99 Fed.Cl. at 244. Rather than challenging the Government's counterclaim for excess reprocurement costs, Counts III and IV seek an affirmative judgment requiring "MES to turn over and pay to Travelers any affirmative recovery in the within action . . . to the extent of Travelers' bond losses." Int. Compl. ¶¶ 42(a), 47(b). Count III further requests "MES to pay into Court any remaining balance on MES' affirmative recovery . . . to be held for the benefit of Travelers as a set-off against any potential award in [the E.D.N.Y. Lawsuit]." Int. Compl. ¶ 42(b). In addition, Count IV further requests a declaration that "in the event of an affirmative recovery by MES as

---

8. Counsel for MES originally represented both Travelers and MES. At the court's request, Trav- elers retained alternate counsel to avoid the conflict of interest that has now become evident.

against the [USPS] ... the claims alleged against Travelers [in the E.D.N.Y. Lawsuit] by the [USPS], with respect to the alleged excess reprocurement costs associated with the Project, are subject to setoff to the extent of any such affirmative recovery by the [USPS]." Int. Compl. ¶ 47(a). These demands exceed defending against "the excess reprocurement costs sought in the Government's counterclaim." *M.E.S. I*, 99 Fed.Cl. at 244. Accordingly, Travelers' July 14, 2011 Complaint–In–Intervention is not governed by *M.E.S. I* or the law-of-the-case doctrine.

The fact that the July 14, 2011 Complaint–In–Intervention exceeded the scope of the *M.E.S. I*, however, does not necessarily require dismissal, particularly since the February 21, 2011 Motion To Intervene was filed by Plaintiff's counsel, whereas the July 14, 2011 Complaint–In–Intervention was filed by independent counsel. The issue before the court is whether the court has independent or ancillary subject matter jurisdiction to adjudicate Counts III and IV of the July 14, 2011 Complaint–In–Intervention.

■ Travelers asserts that it seeks adjudication in its capacity as Plaintiff's equitable subrogee.[9] Int. MTD Op. at 14. The United States Court of Appeals for the Federal Circuit has held that the court has jurisdiction to hear claims brought by sureties against the United States if "the surety ... [is able to] invoke the doctrine of equitable subrogation to step into the shoes of the contractor for the purpose of satisfying the jurisdictional requirements of the Tucker Act, 28 U.S.C. § 1491(a)." *See Nat. Am. Ins. Co. v. United States*, 498 F.3d 1301, 1304 (Fed.Cir.2007); *cf. Great Am. Ins.*, 397 F.2d at 292 ("[T]his court has, without a single dissent in any case, uniformly held that, where the principal suit is on a claim to recover a contract balance held by the Government as a stakeholder, the court has jurisdiction to determine whether the plaintiff or a third party, who claims an interest in the stake, is entitled to recover the money from the United States."). Thus, the court would have independent ju-

risdiction to hear Travelers' claims, if Travelers qualifies as an equitable subrogee.

■ Our appellate court, however, has explained that in order for a surety to qualify as an equitable subrogee after a contractor is terminated for default, the surety "must either take over contract performance or finance the completion of the defaulted contract under its performance bond." *Admiralty Constr., Inc. v. Dalton*, 156 F.3d 1217, 1222 (Fed.Cir.1998). Under this test, Travelers cannot be an equitable subrogee since it refused to assume contract performance or finance completion of the Riverhead Project when the USPS requested that it do so. PX 42. Moreover, the settlement of the USPS's claim that Travelers breached its obligations under the performance bond in the E.D.N.Y. Lawsuit does not provide a basis to invoke the doctrine of equitable subrogation. *See Admiralty Constr.*, 156 F.3d at 1222 (holding that a surety may not invoke equitable subrogation, where it "simply did not perform under its performance bond").

■ Nor is Travelers' reliance upon *American Renovation*, 65 Fed.Cl. 254, and *Great American*, 397 F.2d 289, persuasive. *See* Int. MTD Op. at 6–7. In *Great American*, unlike here, the surety qualified as an equitable subrogee because it "effected the completion of the contract work as required by its bond." *Great Am.*, 397 F.2d at 290. And *American Renovation* determined that the court had independent jurisdiction to adjudicate claims brought by an intervening *assignee* because interpreting the assignment agreement would not require the court to adjudicate private rights but, rather, to "determin[e] the *ownership* of the public right that is at stake in this case, the right to bring suit against the government under the ... Contract." *Id.* at 261 (emphasis added). But a surety, unlike an assignee, does not "own" the public right to sue the United States Government, unless the surety qualifies as an equitable subrogee. Reading *American Renovation* to suggest that the court has independent jurisdiction over claims brought by *any* surety would put the

9. "Subrogation" is defined as "[t]he substitution of one party for another whose debt the party pays, entitling the paying party to rights, reme-

dies, or securities that would otherwise belong to the debtor." BLACK'S LAW DICTIONARY 1563–64 (9th ed. 2009).

court on a collision course with our appellate court's determination, discussed above, that the court only has independent jurisdiction over a surety's claims when the surety qualifies as an equitable subrogee. *See Nat. Am. Ins.*, 498 F.3d at 1304; *see also United Sur. & Indem. Co. v. United States*, 87 Fed.Cl. 580, 587 (2009) ("A ... surety has standing to maintain an action in the United States Court of Federal Claims, *if* the surety: (1) asserts its own rights under a takeover agreement between the surety and the Government ...; *or* (2) invokes the doctrine of equitable subrogation." (emphasis added)).

■ As the court does not have independent subject-matter jurisdiction to adjudicate Counts III and IV, next it must determine whether Travelers may invoke the doctrine of ancillary jurisdiction to seek an adjudication of these claims. In *M.E.S. I*, the court determined that the doctrine of ancillary jurisdiction permitted Travelers to intervene, even though the court might not have independent jurisdiction over Travelers' claims, because parties " 'intervening as a matter of right need not have independent jurisdictional grounds, but instead are covered by the doctrine of ancillary jurisdiction.' " *Id.* (quoting *Klamath Irrigation Dist. v. United States*, 64 Fed.Cl. 328, 334 (2005)). In *M.E.S. I*, however, the court determined that Travelers was entitled to intervene as a matter of right; Plaintiff did not adequately represent Travelers interests, since "Travelers [c]ould potentially be obligated to pay the excess reprocurement costs sought in the Government's counterclaims." *M.E.S. I*, 99 Fed.Cl. at 244. Counts III and IV, however, do not seek to protect Travelers against liability. Nor could they do so given that Travelers has settled the issue of liability with the USPS. Although Travelers may still have "an [indemnity] interest relating to the property or transaction that is the subject of the action" (RCFC 24(a)(2)), it is no longer the case that its interests are not adequately protected, because Plaintiff has the same interest

Travelers would have in prosecuting the affirmative claims against the Government. *See, e.g., Rogers v. United States*, 104 Fed.Cl. 142, 150 (2012) ("It is well settled that representation [for purposes of intervention as of right under RCFC 24(a) ] is adequate when the objective of the applicant is identical to that of one of the parties. Here, both [the plaintiff and the proposed intervenor] have the identical objective in this litigation-maximizing the value to be determined for the exact same [claim].")

Therefore, the remaining claims alleged in Counts III and IV of the July 14, 2011 Complaint–In–Intervention do not satisfy the requirements for intervention as of right. *See* RCFC 24(a)(2).[10] Moreover, the court may not invoke the doctrine of ancillary jurisdiction to adjudicate Counts III and IV of Travelers July 14, 2011 Complaint–In–Intervention. Accordingly, Travelers' July 14, 2011 Complaint–In–Intervention is dismissed. *See* RCFC 12(b)(1), 12(h)(3).

**B. Plaintiff's December 8, 2011 Motion For Summary Judgment On The Government's Counterclaim For Excess Reprocurement Costs.**

**1. Whether The Contract Disputes Act Statute Of Limitations Bars The Court From Adjudicating The Government's Counterclaim.**

**a. Plaintiff's Argument.**

■ Plaintiff argues that the Government's counterclaim for reprocurement costs alleged in the May 19, 2010 Answer was untimely under the Contract Disputes Act. Pl. MSJ at 4–11. The CDA requires "[e]ach claim by ... the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 605(a) (2006). Although the CDA does not define when a claim "accrues," the United States Court of Federal Claims has determined that a claim "accrues on the date when all the

---

10. Of course, Travelers may file a separate action in an appropriate court to adjudicate any claim it may have over any potential funds recovered by Plaintiff in this court. *See Hadden v. United States*, 130 F.Supp. 401, 407 (Ct.Cl.1955) ("In the instant case the intervenors are asking this court to adjudicate claims which they assert against the plaintiff and in which the defendant has no interest. There is no contention by the intervenors that the issues between them and the plaintiff cannot be properly adjudicated in a separate suit.").

events have occurred which fix the contractor's liability.... In a breach of contract claim, the claim accrues when the aggrieved party knew or should have known it had incurred injury." *Am. Ordnance LLC v. United States*, 83 Fed.Cl. 559, 574–75 (2008) (citations omitted).[11] Moreover, the statute of limitations for filing an excess reprocurement claim is not tolled while the Government determines the precise amount of the reprocurement costs. Pl. MSJ at 6–7 (citing, *inter alia*, *United States v. Skidmore, Owings & Merrill*, 505 F.Supp. 1101, 1104 n. 3 (S.D.N.Y.1981) ("The general rule is that a cause of action for breach of contract accrues at the breach, even though the precise amount of damages may not be ascertained until later.")).

The Government's counterclaim for reprocurement costs therefore accrued on June 2, 1999, when the CO terminated Plaintiff for default, as this was the date on which Plaintiff's potential liability accrued. Pl. MSJ at 10. The Government, however, did not file an Answer asserting a counterclaim in the United States Court of Federal Claims until May 19, 2010, *i.e.*, eleven years later, and well beyond the six-year statute of limitations. Pl. MSJ at 9–10. Moreover, this delay was "[p]ure legal strategy" (Pl. MSJ Br. at 10), as evidenced by USPS's August 1, 2003 "Decision Analysis Report" that states:

> Under advisement of counsel, the [USPS's CO] did not proceed to re-procure construction [earlier].... Since re-procurement will no longer prejudice the case, the [USPS] wants to re-start construction.

PX 31 at 1 (emphasis added).

This document confirms the only reason for the USPS's delay was fear that reprocurement would result in the disclosure of information that would harm its defense against Plaintiff's PSBCA appeal of the June 2, 1999 termination for default. Pl. MSJ at 10. Additionally, even *after* reprocurement, the USPS's dilatory conduct continued. The Riverhead Project was completed on June 4, 2005 (Pl. PFUF ¶ 40), but the CO did not issue the Final Decision assessing reprocurement costs until February 19, 2009 (PX 42). Pl. MSJ at 10–11.

**b. The Government's Response.**

The Government responds that its claim for excess reprocurement costs did not accrue until the USPS made final payment to the replacement contractor, *i.e.*, on September 27, 2006. Gov't MSJ Resp. at 3–7. This is because the USPS Purchasing Manual does not allow a CO to request reprocurement costs from a terminated contractor until *after* final payment has been made to the replacement contractor. *See* USPS Procurement Manual, Publ. 41, TL–8 ¶ 6.10.1.b(4) (July 12, 1995) (superseded on May 19, 2005) (reproduced in Gov't MSJ Resp. at A5), *available at* http://about.usps.com/publications/pub41/pub41toc.htm (last visited May 18, 2012) ("[T]he contracting officer must—*after final payment of the repurchase contract*—make a written demand on the contractor for the excess amount[.]" (emphasis added)); *accord* 48 C.F.R. 49.402–6(c) (2011) (implementing a nearly identical requirement for contracts governed by the FAR). Therefore, a claim for excess reprocurement costs does not "accrue" for purposes of Section 605(a) of the CDA until final payment to the replacement contractor is made, because USPS was not entitled to seek reprocurement costs sooner. *See Am. Ordnance* at 574 ("A claim ... accrues on the date when all the events have occurred which fix the contractor's liability *and entitle the claimant to institute an action*." (emphasis added)). The USPS took action within six years of the time it was entitled to assert its reprocurement costs, as allowed under the USPS Procurement Manual, once it asserted the claim via the CO's February 19, 2009 Final Decision, less than three years after making a final payment to the replacement contractor on September 27, 2006. Gov't MSJ Resp. at 5; *see also* PX 42 (the CO's February 19, 2009 Final Decision).

---

11. Plaintiff draws further support for this proposition from a number of cases concluding that claims accrue when liability is fixed for purposes of 28 U.S.C. § 2415(a), which provides a six-year statute of limitations for non-CDA contract claims brought by the United States against private parties. *See* Pl. MSJ at 6–9 (discussing cases). Plaintiff argues these cases are relevant because "there is no reason to distinguish the rationale for use of the term [accrues] in the [CDA] from the interpretation appellate courts have applied to section 2415(a)." Pl. MSJ at 9.

As for the cases cited by Plaintiff discussing 28 U.S.C. § 2415(a), they are irrelevant because Section 2415(a) does not apply to claims that must be asserted under the CDA. *See Motorola, Inc. v. West,* 125 F.3d 1470, 1472 (Fed.Cir.1997) ("[S]ection 2415(a) does not apply to Government claims that cannot be asserted in federal court before issuance of a contracting officer's final decision."). Moreover, Plaintiff's suggestion that the "accrual" of a claim under § 2415(a) is identical to the "accrual" of a claim under the CDA "completely ignores the CDA claims process." Gov't MSJ at 5.

### c. Plaintiff's Reply.

Plaintiff replies that the Government has cited no persuasive authority that its excess reprocurement claim accrued after final payment to the replacement contractor. Pl. MSJ Reply at 2–3. The Government cannot rely upon the FAR or the USPS Procurement Manual because they do not "supersede the law of this [c]ourt and act to toll the limitations period" of the CDA. Pl. MSJ Reply at 3; *see also id.* at 4 (citing *Krueger v. United States,* 26 Cl.Ct. 841, 844 (1992) (holding that a CO's failure to follow agency regulations when issuing a final decision did not toll the CDA statute of limitations)). Likewise, the Government's reliance upon *American Ordnance* is misplaced because the United States Court of Federal Claims held in that case that the statute of limitations commenced from the moment that liability accrued, rather than from the date of a CO's final decision. *Id.* at 3.

Moreover, even if the court were to rely on the USPS Procurement Manual, the USPS did not comply with the Manual's requirement that the CO reprocure "as soon as practicable." USPS Procurement Manual ¶ 6.10.1.b(1) (reproduced at DX 1 at A5). And, although the FAR is not binding on USPS contracts, it emphasizes that "[a]ccrual of a claim means the date when all events, that fix the alleged liability of . . . the Government . . . and permit assertion of the claim were known or should have been

known. . . . *However, monetary damages need not have been incurred.*" 48 C.F.R. § 33.201 (2011) (emphasis added).

### d. The Court's Resolution.

The CDA requires that any claim asserted thereunder by either a contractor or by the Government "shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 605(a) (2006). The United States Court of Appeals for the Federal Circuit has explained that government claims against contractors are perfected when the Contracting Officer issues a final decision adverse to a contractor. *See Malone v. United States,* 849 F.2d 1441, 1443 (Fed.Cir.1988) ("Caselaw supports the proposition that a government decision to terminate a contractor for default is a government claim."), *modified in other party by* 857 F.2d 787 (Fed.Cir.1988); *see also Placeway Constr. Corp. v. United States,* 920 F.2d 903, 906 (Fed.Cir.1990) (affirming that a CO's final decision to assert a government set off was a "claim" under the CDA), *superseded on other grounds by statute,* Court of Federal Claims Technical & Procedural Improvement Act of 1992, Pub.L. No. 102–572 § 907(b), 106 Stat. 4506, 4519 (1992). As such, a Government claim is perfected when the relevant CO issues a final determination, not, as Plaintiff argues, when that claim is re-asserted in a pleading before the United States Court of Federal Claims.

There is no dispute that the CO's June 2, 1999 Notice of Termination for Default was a "final determination," that issued within six years of when USPS's claim accrued.[12] Accordingly, the court has determined that the CO's June 2, 1999 Notice of Termination for Default (PX 5) perfected a claim terminating Plaintiff for default.

The next issue the court must address is the relationship between the termination for default claim submitted by the June 2, 1999 Notice of Termination for Default and the Government's current counterclaim for excess reprocurement costs.

---

12. The court notes, however, that the June 2, 1999 Notice of Termination for Default did not comply with the requirement of the USPS Procurement Manual that termination notices "[s]tate that the supplies or services terminated may be procured against the contractor's account, and that the contractor will be held liable for any excess repurchase costs[.]" USPS Procurement Manual ¶ 6.9.3.b.7(c)(4).

Prior to enactment of the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992) (the "1992 Courts Act"), the United States Court of Federal Claims determined that it had jurisdiction over terminations for default only if the terminations were accompanied by a demand for damages. Our appellate court, however, determined that the Board of Contract Appeals had jurisdiction over terminations for default, even when the Government did not seek reprocurement costs. *See Malone,* 849 F.2d at 1444. *Malone* held that a termination for default, without a damages demand, was a different "claim" from a termination accompanied by a request for damages:

> [T]he BCAs have historically accepted appeals from a CO's decision terminating a contract for default before either the government or the contractor submitted a monetary claim related to the termination. If the government later demanded damages related to the termination, the BCAs treated this as a separate claim.
>
> There is nothing in the CDA or its legislative history to suggest that Congress intended to restrict this practice.

*Malone,* 849 F.2d at 1444 (citations omitted); *see also Sharman Co. v. United States,* 2 F.3d 1564, 1570 n. 7 (Fed.Cir.1993) ("While arguably neither the statute nor the regulation expressly requires a 'separate final decision' on a government claim arising from a default termination, such a requirement is implicit in the language of section 605(a) of the CDA."), *overruled on other grounds by Reflectone Inc. v. Dalton,* 60 F.3d 1572, 1579 & 1579 n. 10 (Fed.Cir.1995) (en banc).[13]

■■■ The 1992 Courts Act, however, extended the jurisdiction of the United States Court of Federal Claims to authorize the court to adjudicate certain non-monetary CDA claims, including those regarding termi-

nation for default. *See* Pub.L. No. 102–572 § 907(b)(1) (codified at 28 U.S.C. § 1491(a)(2)); *see also Garrett v. Gen. Elec. Co.,* 987 F.2d 747, 750 (Fed.Cir.1993) (observing that the 1992 Courts Act was designed to "preserve[ ] jurisdictional parity between the Court of Federal Claims and the boards [of contract appeals]"). Therefore, the United States Court of Federal Claims has jurisdiction over two *separate* types of government claims: claims that a contractor must be terminated for default, and claims that the government is entitled to excess reprocurement costs as a result of the default. Moreover, it is because the court recognizes that termination and the resulting excess reprocurement costs are separate claims that the court continues to follow the *Fulford* doctrine. *See Roxco, Ltd. v. United States,* 60 Fed.Cl. 39, 46–47 (2004) (determining that the *Fulford* doctrine, though derived from non-binding BCA cases, still applies in the United States Court of Federal Claims). The *Fulford* doctrine treats an assessment of excess reprocurement costs as a separate government claim from the original decision to terminate, but permits the contractor to bring a late challenge to the original termination decision once excess reprocurement fees have been asserted. *Id.* The *Fulford* doctrine exists in recognition of the fact that it may only be worth a contractor's effort to challenge a termination for default in the event that the Government subsequently seeks excess reprocurement costs. *Id.* at 47 (" '[T]he assessment of excess costs does not ordinarily occur at the time of the default termination, [so] a contractor may choose not to contest the default termination because the contractor does not anticipate any monetary liability.' " (quoting *Marshall Assoc. Contractors, Inc. v. United States,* 31 Fed.Cl. 809, 815 (1994))).

---

**13.** Similarly, the United States Court of Appeals for the Federal Circuit has held that a CO need not make a determination of damages in a termination for default case prior to the appellate court reviewing a BCA's original determination that an agency properly terminated a contractor for default. *See Dewey Elecs. Corp. v. United States,* 803 F.2d 650, 656 (Fed.Cir.1986) (explaining that otherwise "the contractor would find it necessary to seek a decision from the contracting officer on both the quantum and entitlement issues and appeal both to the board to be adjudicated at the same time. At both levels, additional burdens would be placed on the parties, as well as the adjudicatory officials, to marshal and analyze detailed cost data and financial information pertaining to damages, all of which may be unnecessary if, on appeal, the entitlement is decided adversely to the contractor.").

▇ The USPS Procurement Manual also emphasizes that a "claim" under Section 605(a) of the CDA is defined in part by the requested remedy. The USPS Procurement Manual defines a CDA "claim" as

[1] A written demand or written assertion by one of the contracting parties [2] seeking, as a matter of right, [3] the payment of a specified sum of money, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim.

USPS Procurement Manual, ¶ 6.8.1.c(1); accord 48 C.F.R. § 33.201 (1999) (providing an almost identical definition for "claim"); [14] see also Reflectone, 60 F.3d at 1573 (relying upon FAR 33.201 for the definition of "claim"). Accordingly, an equitable Government "claim" terminating a contractor for default is separate under the CDA from a "claim" seeking reprocurement money damages, because the claims seek different remedies.

Since an excess reprocurement claim is separate from the underlying termination claim, the Government must "submit" a claim for excess reprocurement costs separately within the six-year statute of limitations provided by the CDA, i.e., "within 6 years after the accrual of the claim." 41 U.S.C. § 605(a).

▇ In this case, the Government insists that the claim for excess procurement costs did not accrue until the Government knew the precise reprocurement costs. Plaintiff, however, argues that the claim for excess reprocurement costs accrued at the same time as USPS's equitable claim for termination for default.

As a general proposition, the court agrees with Plaintiff that "a breach of contract claim . . . accrues when the aggrieved party knew or should have known it had incurred injury," and not when the exact quantum of damages is evident. Am. Ordnance, 83 Fed.Cl. at 575;

accord 48 C.F.R. § 33.201 (2011) ("Accrual of a claim means the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been incurred."). As discussed above, however, excess reprocurement claims are unique. Malone, the Fulford doctrine, and the USPS Procurement Manual all separate an excess reprocurement claim from the underlying termination for default claim to promote administrative efficiency. See, e.g., Marley v. United States, 423 F.2d 324, 333 (Ct.Cl.1970) (explaining that the point of a separate action for excess reprocurement in contracts governed by the CDA is that it "relieves the Government of the burden of proving market value in a suit for damages for breach of contract."). But these efficiency gains would be lost, and the distinction between the two types of claims would be meaningless, if the excess reprocurement claim accrued at the same time as the termination for default claim. Such a requirement could force the Government to prove excess reprocurement costs using market value estimates, the very issue that separating the claim for termination from the claim for excess reprocurement costs seeks to avoid.[15]

For this reason, the USPS Procurement Manual requires that the CO make a final payment before demanding excess reprocurement costs. USPS Procurement Manual ¶ 6. 10. 1.b(4) (reproduced at DX 1 at A5) ("[T]he contracting officer must—after final payment of the repurchase contract—make a written demand on the contractor for the excess amount, taking into account any increases or decreases in cost due to transportation charges, discounts, and other factors." (emphasis added)); accord 48 C.F.R. § 49.402–6(c) (2011) ("[T]he contracting officer shall, after completion and final payment

<hr/>

14. Subsequently, the FAR has been amended and no longer defines "claim." See 48 C.F.R. § 33.201 (2011) (defining other terms, but not "claim"). The cited definition, however, would have been applicable when Plaintiff was terminated for default.

15. Notably, this distinction works to contractors' advantage under the Fulford doctrine, because it permits contractors to bring what would otherwise be an untimely challenge to their termination for default once confronted with a claim for excess reprocurement costs.

of the repurchase contract, make a written demand on the contractor for the total amount of the excess, giving consideration to any increases or decreases in other costs such as transportation, discounts, etc."). The CDA authorizes the court to consider such regulations in determining when a claim "accrues." *See Dawco Constr., Inc. v. United States,* 930 F.2d 872, 877 (Fed.Cir.1991) ("The CDA does not explicitly list comprehensive requirements for a claim in all situations. Therefore, a contested claim's sufficiency may properly be evaluated against regulations implementing the CDA, the language of the contract in dispute, and the facts of the case." (citations omitted)), *overruled on other grounds by Reflectone,* 60 F.3d at 1579.

Accordingly, the court has determined that a claim for excess reprocurement costs "accrues" under the CDA, when final payment is made to a replacement contractor. In this case, the Government's excess reprocurement cost claim accrued on September 27, 2006, when it made final payment. PX 42. Therefore, the USPS timely "submitted" a claim under 41 U.S.C. § 605 for excess reprocurement costs on February 19, 2009, the date on which the CO issued his Final Decision assessing excess reprocurement costs against Plaintiff.[16]

**2. Whether The Government's Counterclaim For Excess Reprocurement Costs Nevertheless Must Be Dismissed Because The United States Postal Service Delayed The Reprocurement.**

**a. Plaintiff's Argument.**

Plaintiff argues that even if the Government's counterclaim for excess reprocurement costs was timely, undisputed facts require that the counterclaim must fail because the Government failed to mitigate potential damages. Pl. MSJ at 11–16. As matter of law, it is settled that the Government is not permitted to request adjudication of a claim for excess reprocurement costs, unless the Government acts reasonably to mitigate those costs. *See Marley,* 423 F.2d at 333 ("The [excess reprocurement] award is ... conditioned upon proof of a reprocurement action reasonably designed to minimize the excess costs."). In other words, the CO must have "act[ed] within a reasonable time after default," in order for the Government to be entitled to seek reprocurement costs for the Riverhead Project. *Astro-Space Labs., Inc. v. United States,* 470 F.2d 1003, 1018 (Ct.Cl. 1972).

In this case, the USPS's four-year delay in reprocuring the Riverhead Project contract resulted in "increased costs due to various factors including, but not limited to, additional architectural, engineering, construction management, and site maintenance costs, cost escalation for labor and material, additional cost associated with the deterioration of the site following MES' termination, as well as costs associated with change in code and USPS standards between the date of termination and the date of reprocurement." Pl. MSJ at 12 (citing PX 8 (Gov't Consultant's Report identifying these costs)). Moreover, Grayhawk North America, LLC ("Grayhawk"), a Government consultant, admitted that the Riverhead Project could have been completed within 15 months had it been timely reprocured, "allow[ing] 3 months for re-soliciting the project and 12 months for construction." PX 8 at 3. Furthermore, the CO's August 26, 1999 letter to Plaintiff, indicated that the USPS estimated reprocurement would cost approximately $2.8 million in 1999, that should have resulted in the Riverhead Project being completed on budget, with no excess reprocurement costs. PX 26. Thus, "it is abundantly clear that had [the USPS] immediately reprocured, it could

---

16. This determination will not result, as Plaintiff predicts, in "the world ... awaiting reprocurement with final payment coming at some indefinite time, perhaps decades from now, [as the Government] would be well within the limitations period mandated by law." Pl. Reply at 5. To the contrary, if the Government waits too long to reprocure or make a final payment, any claim for excessive reprocurement costs may be barred by laches, *see Cornetta v. United States,* 851 F.2d

1372, 1376 (Fed.Cir.1988) (*en banc*) (recognizing that the defense of laches "has traditionally been unavailable in actions at law brought within the applicable statute of limitations," but noting that the defense has still been applied in appropriate circumstances), or by its failure to mitigate (Plaintiff's argument in the alternative in this case), even if the claim is filed within six years of when the claim accrues under the CDA.

have completed the [Riverhead] Project . . . . within the original budget." Pl. MSJ at 13.

In addition, the USPS's delays in reprocurement were unjustified. Pl. MSJ at 14–16. Initially, the USPS intended to reprocure immediately. PX 30 (Oct. 12, 1999 letter from CO stating "the [USPS] is forced to re-procure the project in order to complete it timely"). An August 1, 2003 USPS Decision Analysis Report, however, suggests that the USPS elected instead to delay reprocurement per "advisement of counsel" to avoid "prejudice" to the USPS's defense before the PSBCA of its decision to terminate Plaintiff for default. PX 31 at 1. In fact, the CO testified, in a deposition, that there was "no reason" for the USPS not to commence reprocurement in 2000. PX 9 at 16 (deposition testimony of Mr. Dane Weir, USPS CO). Moreover, when the USPS decided to reprocure the Riverhead Project, the CO's Representative requested a substantially different design, so USPS was required to handle this new solicitation " 'from scratch[.]' " Pl. MSJ at 14–15 (quoting PX 37 at 29 (deposition testimony of Mr. Paul Yu)). Thus, the USPS's inexcusable delays collectively evidence a failure to mitigate. Pl. MSJ at 16.

**b. The Government's Response.**

The Government responds that the existence of factual disputes prevents entry of summary judgment on Plaintiff's failure to mitigate defense. Gov't MSJ Resp. at 7–9. Specifically, Plaintiff ignores that the CO's February 19, 2009 Final Decision indicated that Plaintiffs were not being held responsible for costs attributable to reprocurement delays. See PX 42 (subtracting costs associated with cost escalations, design changes, and site deterioration from the amount assessed against Plaintiff); accord 48 C.F.R. § 49.402–6(c) (requiring COs, when assessing reprocurement costs, to give "consideration to any increases or decreases in other costs such as transportation, discounts, etc."). Likewise, the Grayhawk Consulting Report that Plaintiff cites to establish that USPS's delay was costly also excluded costs associated with the reprocurement delay from those

attributable to Plaintiff's actions. Gov't MSJ Resp. at 8 (discussing PX 8).

The Government also submitted excerpts from the expert report of Mr. Stephen A. Weathers, P.E., of Capital Project Management, Inc., wherein Mr. Weathers calculates that, even if the USPS promptly reprocured, Plaintiff would have been liable for $727,707 in excess reprocurement costs. DX 1 at A19. As such, a significant issue of fact has been presented, requiring a trial. Gov't MSJ Resp. at 8–9.

**c. Plaintiff's Reply.**

Plaintiff replies that the fact that the CO's February 19, 2009 Final Decision did not assess costs related to the reprocurement delay is irrelevant. Pl. MSJ Reply at 6–7. As a matter of law, the Government may not sustain a claim for excess reprocurement costs after failing to conduct a timely and reasonable reprocurement. See Marley, 423 F.2d at 333 ("When the reprocurement relied upon by the Government is found, for a sufficient reason, not to have been [reasonably] designed, it may not be the basis for an award, and the right to excess costs is lost." (emphasis added)); see also Rumley v. United States, 285 F.2d 773, 775 & 777 (Ct.Cl. 1961) (affirming an Armed Services Board of Contract Appeals determination that a six month delay in reprocurement barred an action for excess reprocurement costs).

In addition, Plaintiff replies that there is no factual dispute as to whether timely reprocurement would have led to completion of the Riverhead Project on the original budget, in light of the USPS's contemporaneous estimate that on-budget reprocurement was possible. Pl. MSJ Reply at 7–8 (citing PXs 7, 26).[17]

**d. The Court's Resolution.**

The Government's May 19, 2010 Answer to the February 16, 2010 Complaint asserts a counterclaim for excess reprocurement costs under USPS Contract Clause B–13, entitled "Termination for Default." Ans. ¶¶ 43–45. The Answer, however, does not assert a separate counterclaim for general common law

17. Plaintiff did not address whether the expert report of Mr. Weathers creates a factual dispute sufficient to defeat summary judgment. In light of the court's resolution herein, however, the court need not reach this question.

breach damages or for relief based on any provision of the September 10, 1998 Contract other than the "Termination for Default" provision. Ans. ¶¶ 42–55. For the reasons discussed below, these omissions are significant.

The United States Court of Claims has held that a claim for excess reprocurement costs, based upon the "Termination for Default" clause of a government contract, is distinct from a general breach of contract claim for common law contract damages, even if the two claims are based on the same conduct. *See Marley*, 423 F.2d at 333 (holding that the Government "lost" a claim for excessive reprocurement costs by conducting an unreasonable reprocurement, but nonetheless allowing the Government to assert a separate claim for damages based on common law breach of contract); *see also Rumley v. United States*, 285 F.2d 773, 777 (Ct.Cl. 1961) (holding that the Government could seek damages for a common law breach of contract claim, even though its excess reprocurement claim was barred because of an untimely reprocurement).

As such, it is now established that a claim for excess reprocurement costs under the "Termination for Default" clause is different than one asserted under common law, in that [a] proper reprocurement relieves the Government of the burden of proving market value in a suit for damages for breach of contract. The contractor's pocket must, however, be protected from the consequences of an extravagant or improper reprocurement. The award is therefore conditioned upon proof of a reprocurement action reasonably designed to minimize the excess costs. When the reprocurement relied upon by the Government is found, for a sufficient reason, not to have been so designed, [the reprocurement] may not be a basis for an award, *and the right to excess costs is lost.*

*Marley*, 423 F.2d at 333 (emphasis added); *see also Mega Constr. Co. v. United States*, 29 Fed.Cl. 396, 487 (1993) ("The excess cost language of the Termination for Default clause is designed to avoid the need to prove market price by calculating breach damages through a formula to derive market value at the time of breach, less the contract price. When the excess reprocurement costs paragraph is inapplicable by reason of a belated reprocurement or otherwise, breach damages may be computed from other available evidence, under the authority of the reservation-of-rights paragraph[.]"). In other words, the difference between proceeding under the "Termination for Default" clause, instead of seeking general common law breach damages matters.

For this reason, the United States Court of Appeals for the Federal Circuit has held that an excess reprocurement claim may only proceed if the Government's actions are consistent with the rationale behind the reduced evidentiary burden offered by a claim for excess reprocurement costs, *i.e.*, if the Government demonstrates that

(1) the reprocured supplies are the same as or similar to those involved in the termination; (2) the Government actually incurred excess costs; and (3) the Government acted reasonably to minimize the excess costs resulting from the default.

*Cascade Pacific Int'l v. United States*, 773 F.2d 287, 293–94 (Fed.Cir.1985).

 The requirement that the Government "act reasonably" likewise requires the CO to "act within a reasonable time after default[.]" *Astro–Space Labs.*, 470 F.2d at 1018.[18] A "reasonable time depends on the facts and circumstances that exist in a particular situation, but the test is usually whether the contractor was charged a higher price due to the passage of time." *Id.* Accordingly, a claim for excess reprocurement costs

---

18. The USPS similarly requires that the CO reprocure quickly and efficiently. The USPS Procurement Manual states:

> When supplies or services are still required after termination for default, the contacting officer may repurchase the same or similar supplies or services against the contractor's account *as soon as practicable* .... Whenever

practicable, the contracting officer should make necessary repurchase decisions *before* issuing the termination notice.

USPS Procurement Manual ¶ 6.10.1.b(1) (emphasis added) (reproduced at DX 1 at A5); *accord* 48 C.F.R. § 49.402–6(a) (2011) (analogous FAR provision requiring COs to reprocure "as soon as practicable").

must be dismissed where an agency unreasonably delayed reprocurement and if that delay resulted in higher costs or otherwise prejudiced the contractor. *See id.* The Government, however, still may proceed under a general breach of contract theory, but it must shoulder the heavier burden of proving actual damages, rather than relying only on the costs of reprocurement. *See Marley,* 423 F.2d at 335 ("The ... denial of [the Government's claim for] excess [reprocurement] costs ... left the [G]overnment free to bring [a] suit for damages for breach of contract."); *see also* JOHN CIBINIC, JR., RALPH C. NASH, JR., & JAMES F. NAGLE, ADMINISTRATION OF GOVERNMENT CONTRACTS 981 (4TH ED. 2006) ("The ease of proving excess [reprocurement] costs ... makes it a far more desirable remedy in most cases than attempting to prove damages.").

■ Based on the record in this case, the court has determined that there is no triable issue of fact as to whether the USPS reprocured in a reasonable fashion. For example, the CO's deposition testimony stated that there was "no reason" why the contract was not reprocured in the year 2000, and that he could not recall any reason for the continuing failure to reprocure during 2001–03. PX 9 at 16–18 (deposition testimony of Mr. Weir). In addition, the evidence suggests that the delay in reprocurement was part of the Government's litigation strategy. PX 31 at 1 (Aug. 1, 2003 "Decision Analysis Report" indicating that the CO did not reprocure previously "[u]nder advisement of counsel" and that reprocurement could proceed once "reprocurement will no longer prejudice the case"). More importantly, the Government has not rebutted this evidence, nor suggested any other reason for the four-year delay in initiating the reprocurement. Absent such evidence, or at least an offer of proof, there is no disputed issue of fact as to whether an unexplained four-plus-year delay is reasonable. *See Eagle Aviation, Inc. v. United States,* 9 Cl.Ct. 128, 136 (1985) ("[I]t is perilous for a party opposing a motion for summary judgment not to proffer any countering evidentiary materials or file counter affidavits.") (citing *Adickes v. Kress & Co.,* 398 U.S. 144, 159–61, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *see also Martin J. Simko Const.,*

*Inc. v. United States,* 11 Cl.Ct. 257, 273 (1986) (determining that a one-year delay, under circumstances where reprocurement could have reasonably occurred in 90 days, was unreasonable), *vacated and remanded in part on other grounds,* 852 F.2d 540 (Fed. Cir.1988).

In addition, Plaintiff has presented unrebutted evidence that reprocurement costs escalated during the lengthy delay. For example, a Government-commissioned consultant determined, at the time of Plaintiff's termination for default, that reprocurement would cost only $2.8 million, which would have brought the entire project in on budget. PX 7–8; *see also* PX 26 (Aug. 26, 1999 letter from USPS to Plaintiff indicating that $2.8 million was required to complete "all work"). Whether the original estimates were correct or not might arguably be a contested issue of fact in light of Mr. Weathers' expert report, concluding that timely reprocurement would still have led to significant cost overruns. *See* DX 1 at A18–19. It is *not,* however, contested that during the delay reprocurement costs increased by approximately $1.2 million as a result of: "escalation in costs;" "deterioration of the worksite during the time period before the [USPS] reprocured the contract;" "changes in codes and Postal standards;" and USPS requested "betterments." *Compare* PX 42 (CO's Feb. 19, 2009 Final Decision assessing reprocurement costs, and subtracting for the aforementioned increases), *and* PX 8 (Nov. 3, 2008 report by Grayhawk citing the same cost escalations), *with* DX 1 at A 18–19 (Mr. Weathers' similar, though not identical, estimates for cost escalation and other delay-based costs).

It is also immaterial that the USPS only requests those portions of the reprocurement for which it calculates Plaintiff is responsible. As explained above, our appellate court's decisions in *Marley, Rumley,* and *Cascade Pacific* require dismissal of a claim for excess reprocurement costs brought pursuant to the "Termination for Default" clause of a government contract if the Government allowed reprocurement costs to escalate through unreasonable delay. In short, the Government loses the evidentiary advantage provided by an excess reprocure-

ment costs claim if the agency's unreasonable behavior makes it difficult to calculate what portion of the increased reprocurement costs, if any, are attributable to the agency's delay. *See Marley*, 423 F.2d at 333.

In this case, the Government's counterclaim cannot be reasonably understood to assert an alternate claim for general common law breach damages or damages pursuant to any other provision of the September 10, 1998 Contract. *See* Answer ¶¶ 41–55 (referencing no part of the Sept. 10, 1998 Contract except for the "Termination for Default" clause and seeking damages "pursuant to" that clause).[19]

For these reasons, the court has determined that Plaintiff has met its burden of showing that there is no triable issue of fact as to whether the USPS's delays were reasonable and caused a substantial escalation in reprocurement costs. Plaintiff is therefore entitled to summary judgment with respect to the Government's counterclaim for excess reprocurement costs because the record on summary judgment shows as a matter of undisputed fact and law that the USPS failed to mitigate by reprocuring in a reasonable and timely manner.

## V. CONCLUSION.

1. For the foregoing reasons, Plaintiff's August 4, 2011 and the Government's August 31, 2011 Motions To Dismiss Travelers' Complaint–In–Intervention are granted. Travelers' July 14, 2011 Complaint–In–Intervention is dismissed, and the Clerk of Court shall enter judgment accordingly.

2. In addition, Plaintiff is entitled to summary judgment in its favor on the Government's counterclaims.

**IT IS SO ORDERED.**

**19.** Moreover, a claim for general common law breach damages, if asserted at this point, or even by the CO's February 19, 2009 Final Decision, would almost certainly be untimely under the CDA's six-year statute of limitations. The court is aware of no reason why a claim for general common law breach damages would not be subject to the general rule that "a breach of contract claim ... accrues when the aggrieved party knew or should have known it had incurred injury." *Am. Ordnance*, 83 Fed.Cl. at 575. The exception to this rule for CDA claims for excess reprocurement costs, as explained above, is based upon the unique nature of these claims under the CDA and relevant regulations. These factors are not present in a claim for general common law breach damages.